PEOPLE v JAFFRAY

Docket No. 95144. Argued October 7, 1993 (Calendar No. 12). Decided June 7, 1994.

Thomas Jaffray, Jr., and a codefendant, were convicted following a bench trial in the Detroit Recorder's Court, Michael L. Stacey, J., of kidnapping by secret confinement. The Court of Appeals, MURPHY, P.J., and SHEPHERD and T. S. EVELAND, JJ., reversed in an unpublished opinion per curiam, determining that because third parties were aware of the victim's detention, the evidence was insufficient to sustain the conviction of secret confinement kidnapping (Docket No. 116792). The people appeal.

In an opinion by Justice GRIFFIN, joined by Chief Justice CAVANAGH, and Justices BRICKLEY and MALLETT, the Supreme Court held:

There was sufficient evidence to justify a finding beyond a reasonable doubt by a rational trier of fact that the defendant was guilty either of kidnapping by forcible confinement with intent to secretly confine or of kidnapping by secret confinement.

1. A kidnapping conviction may be premised on a showing of confinement that in fact is secret or on a showing of forcible seizure or confinement with intent to secretly confine, regardless of whether the confinement remains a secret. To convict an accused of forcible confinement with intent to secretly confine, the prosecution must prove a forcible seizure, confinement, inveigling or kidnapping of another done wilfully, maliciously, and without lawful authority with the intent to cause the person to be secretly confined or imprisoned involuntarily. In this case, the evidence produced was sufficient to support a finding by a rational trier of fact beyond a reasonable doubt that the defendant forcibly seized or confined the victim with the intent to secretly confine him.

2. To be guilty of secret confinement kidnapping, an accused

REFERENCES

Am Jur 2d, Abduction and Kidnapping §§ 21-27.

Necessity and sufficiency of showing, in kidnapping prosecution, that detention was with intent to "secretly" confine victim. 98 ALR3d 733.

must wilfully, maliciously, and without legal authority, secretly confine or imprison another person by force without the person's consent. The essence of secret confinement is the deprivation of the assistance of others by virtue of the victim's inability to communicate the predicament. It is not predicated solely on the existence of a single factor; rather, consideration of the totality of the circumstances is required. That others may be suspicious or aware of the confinement is relevant to the determination, but is not always dispositive. In this case, under the circumstances, a rational trier of fact could have found the defendant guilty beyond a reasonable doubt of secret confinement kidnapping. That a disinterested person learned of the confinement is not dispositive, and while the duration of the confinement is relevant, it is but one factor to be considered. There is no doubt that the victim, throughout the period of confinement, was precluded from effectively communicating his plight or location to others.

Justice BOYLE, joined by Justice RILEY, concurring, stated that the only issue raised on appeal is the sufficiency of the evidence of secret confinement. It is not an appropriate case to address in dicta unraised issues regarding the length of confinement.

Reversed and remanded.

Justice LEVIN, writing separately, stated that it is questionable whether the Legislature intended to make secret confinement a capital offense where, as in this case, although the manner or length of confinement was not insignificant, there was evidence only of an intent to confine, and no evidence of an intent to harm, the victim or to hold the victim as a hostage for ransom or other felonious purpose. The secret confinement provision of the kidnapping statute ought to be construed to require some significant manner or length of detention, otherwise, defendants might be convicted of true kidnapping when they merely have committed false imprisonment.

An accused cannot be convicted of secret confinement kidnapping no matter how strong the desire to secretly confine the victim if the confinement in fact was not secret. In this case, Jaffray's participation in a concerted effort to maintain the secrecy of Williams' confinement is not pertinent to a determination whether Williams in fact was secretly confined. Nor did Jaffray commit secret confinement kidnapping by carrying Williams to the basement, because by the time he was carried to the basement, he had already communicated his plight to the outside world. Further, Jaffray had no intent to harm Williams.

1. KIDNAPPING — FORCIBLE CONFINEMENT — SECRET CONFINEMENT

   To convict an accused of forcible confinement with intent to
   secretly confine, the prosecution must prove a forcible seizure,
   confinement, inveigling or kidnapping of another done wilfully,
   maliciously, and without lawful authority with the intent to
   cause the person to be secretly confined or imprisoned involun-
   tarily (MCL 750.349; MSA 28.581).

2. KIDNAPPING — SECRET CONFINEMENT — DEPRIVATION OF ASSIS-
   TANCE — INABILITY TO COMMUNICATE.

   To be guilty of secret confinement kidnapping, an accused must
   wilfully, maliciously, and without legal authority, secretly con-
   fine or imprison another person by force without the person's
   consent; the essence of secret confinement is the deprivation of
   the assistance of others by virtue of the victim's inability to
   communicate the predicament; it is not predicated solely on the
   existence of a single factor; rather consideration of the totality
   of the circumstances is required (MCL 750.349; MSA 28.581).

*Frank J. Kelley,* Attorney General, *Thomas L.
Casey,* Solicitor General, *John D. O'Hair,* Pros-
ecuting Attorney, *Timothy A. Baughman,* Chief,
Research, Training and Appeals, and *Don W.
Atkins* and *Karen D. Woodside,* Assistant Attor-
neys General, for the people.

*Suzanne Carol Schuelke* for the defendant.

GRIFFIN, J. Following a bench trial, this defen-
dant was found guilty of kidnapping by secret
confinement.[1] Because third parties became aware
of the victim's detention, the Court of Appeals
determined that the evidence was insufficient to
sustain the conviction. We disagree and reverse.

I

Defendant Thomas Jaffray, Jr., and two codefen-
dants, brothers Ronald and Martin Normandin,

---

[1] MCL 750.349; MSA 28.581.

were charged and tried jointly for kidnapping[2] as a result of acts committed before the fatal beating of Bruce Williams on August 13, 1987, in the basement of a house that Williams, the victim, shared with the codefendants.[3] Another resident of the home, Francis Hamilton, was accused of beating the victim with a nail-studded baseball bat, which resulted in Williams' death. Hamilton was tried separately for first-degree murder.[4]

At the bench trial of Jaffray and his two codefendants, the prosecution called six witnesses and presented three statements that had been given to the police, one by each of the three codefendants. References in each statement to either of the other two codefendants were blocked out,[5] and the three redacted statements were placed in evidence by stipulation. None of the codefendants testified and they called no witnesses.

The record reflects little dispute concerning the sequence of events that preceded the killing of Williams. On August 13, 1987, Ronald Normandin arrived home at about 3:30 A.M. and noticed that his dog, a pit bull terrier, was missing. Later that

---

[2] Specifically, the information charged that the defendants "wilfully, maliciously and without lawful authority forcibly or secretly confined the above-named complainant within the State of Michigan, against complainant's will, contrary to sec. 750.349, M.C.L.A."

[3] Mrs. Lois Normandin, mother of the Normandin brothers, owned and also resided in the house located at 16814 Strathmoor in the City of Detroit.

[4] MCL 750.316; MSA 28.548. After a jury trial, Francis Hamilton was convicted of second-degree murder. MCL 750.317; MSA 28.549. On appeal, which was consolidated with the appeal by Thomas Jaffray, Jr., the Court of Appeals reversed Hamilton's conviction in an unpublished opinion per curiam and ordered a new trial on the ground that the prosecutor failed to correct erroneous testimony elicited from a principal witness to the effect that nothing had been promised in return for the witness' testimony. Decided July 28, 1992 (Docket No. 110051).

[5] See *Bruton v United States*, 391 US 123; 88 S Ct 1620; 20 L Ed 2d 476 (1968). See also *People v Banks*, 438 Mich 408; 475 NW2d 769 (1991).

morning in the living room of the home, codefendants Ronald and Jaffray confronted and accused Williams of taking the dog. Initially, Williams claimed the dog had been stolen. However, after Jaffray threatened him with the nail-studded bat, Williams admitted that he had sold the dog for $20 to buy crack cocaine.

Upon further questioning, Williams indicated that the dog could be located at a house on Puritan Street several blocks away. After securing this information, handcuffs were placed on Williams' wrists, which were shackled behind his back. Jaffray then tied Williams' feet with rope and attached the rope to the handcuffs.[6]

Williams offered to participate in an initial search for the dog, but Jaffray refused. Instead, Jaffray stayed behind to guard Williams while one of the other codefendants set out in Jaffray's car to locate and retrieve the pit bull.[7] However, the codefendant soon returned after an unsuccessful search. Williams then provided additional information concerning the dog's location. Again, Jaffray

[6] In Jaffray's redacted statement, he said:

_____ handcuffed Bruce, with his hands behind his back. I asked _____ if he had something that I could tie [the victim's] feet with, and _____ brought me some rope. Bruce was lying on the couch, on his stomach. I told Bruce what I was going to do. Tie up his feet. I asked Bruce to lift up his feet. So, he did, and I tied his feet up with the rope. Then, I tied the rope up to the handcuffs. Then I laid him on the floor, by the couch.

[7] In his statement to the police, Jaffray recalled:

_____ had the information about the dog. Bruce wanted to go with us. But, I didn't want to take him in my car. So, I told _____ to take my car. _____ left. While _____ was gone, I was talking to Bruce. I told Bruce, that when _____ comes back with the dog, that I was going to let him go.

refused to allow Williams to help search for the
dog. This time, Jaffray and a codefendant departed
while, at Jaffray's suggestion, the other codefen-
dant stayed behind to guard the victim for the
duration of the search, which lasted approximately
fifteen minutes.[8]

Although the specific time frame of this episode
is unclear from the record, it is fixed in part by
the testimony of Curtis Kennedy, a friend of Wil-
liams who lived across the street. Kennedy testi-
fied that, when he attempted to visit Williams
between 8:00 A.M. and 9:00 A.M.,[9] he met Ronald
Normandin outside the Normandin home, where
Ronald indicated that Williams was "dog-tied"
upstairs because he had sold the pit bull for crack
cocaine. Kennedy further testified that he heard
Williams' cries for help coming from the upstairs
portion of the house.[10] Kennedy then ran home

[8] In his statement, Jaffray stated:

    Well, then _____ came back. _____ said, that
he could' [sic] not find the house. We was asking him about
where the house was. So, Bruce was saying that there was a
white Audi next to the house. So, I asked _____ to watch
Bruce, while me and _____ went and looked for the
house. . . . It took us about five minutes, and we found the
house. I sat in the car, while _____ went up to the door.
_____ was knocking on the door for about ten minutes.
Nobody answered, so _____ came back to the car.
_____ stated to me, that he had heard his dog, braking
[sic] in there. So, we went back to the house.

[9] Kennedy testified as follows:

    Q. (By Mr. Burke, continuing): Mr. Kennedy, the approxi-
mate time when you went across the street to talk to Bruce
was about nine o'clock—did you indicate?
    A. No, it was earlier than that. I'd say around between eight
and nine. I don't know exactly which time it was.

[10] Specifically, Kennedy testified as follows:

    A. As I got over there, I am going to the side of the house, I
met Ronnie coming outside of the house.

and informed his mother, Minnie Collins, of his discovery.

After this disclosure, Mrs. Lois Normandin, mother of the Normandin brothers, warned the codefendants that Williams had been "making a lot of noise" while they were out searching for the dog.[11] Unbeknown to anyone outside the home, Jaffray and a codefendant then took Williams to the basement,[12] where Jaffray placed a "gag" in

---

\* \* \*

*Q.* What did Ronnie tell you?

\* \* \*

*A.* He said, "Did you hear about what happened?" I said, "No." Ronnie said, "Yes, Bruce sold my dog—I mean crack for $20—crack."

\* \* \*

*A.* . . . Ronnie mentioned that he had sold the dog for a crack, so I asked Ronnie where was Bruce and Ronnie told me they had Bruce upstairs dog-tied.

*Q.* When you heard they had him dog-tied, what did you do?

\* \* \*

*A.* I went to leave. I could hear my friend's voice upstairs like he was begging for help.

\* \* \*

*Q.* That's a three level home? There's a basement, first floor and second floor?

*A.* Yes, sir.

*Q.* When you say upstairs, do you mean on the first level?

*A.* No, upstairs.

*Q.* In the bedroom?

*A.* Yes, sir.

*Q.* No question in your mind about that?

*A.* No, sir.

---

[11] Jaffray recalled in his redacted statement:

So, we went back to the house. _____'s mother said, you better get into the living room with _____, Bruce is yelling. He's making a lot of noise. . . . That's what _____'s mother was saying.

[12] In its opinion pertaining to the consolidated appeals of Jaffray and Hamilton, the Court of Appeals stated that Jaffray and Ronald

Williams' mouth and tied him to a pole with an extension cord.[13] Later, while Williams remained confined in the basement,[14] Hamilton allegedly bludgeoned Williams to death with the nail-studded bat.[15]

Minnie Collins called the police at approximately 10:20 A.M. When the officers arrived at 11:25 A.M., Collins told them that Williams was in

returned to the home at approximately 9:20 A.M., whereupon Martin and Jaffray moved Williams to the basement. Although Jaffray, who did not testify in his own trial, testified one week later in Hamilton's murder trial that these events occurred at approximately 9:20 A.M., this evidence is not part of the record in the appeal before us and we do not rely upon it.

[13] Jaffray acknowledged in his redacted statement:

So, me and _____ we carried Bruce downstairs. Then we tied him to an "I" beam in the work shop. Then, me and _____ went back upstairs.

\* \* \*

Q. Did you tie the cord and towel around Bruce's neck?
A. When he was frist [sic] put downstairs, I tied it around his mouth to gag him.

[14] The record does not indicate the specific time when Williams was moved to the basement. However, it appears the beating occurred at approximately 10:00 A.M., on the basis of the testimony of Audrey Diefenbach, a friend of Jaffray who slept at the Normandin home the night before:

Q. Now, after [Frank Hamilton] goes downstairs, you got the uneasy feeling in your stomach. . . .
A. I heard some noises downstairs also. I looked at the clock. . . . It was around right before ten o'clock or something like that. [Also, see n 38.]

[15] Although no one outside the Normandin home had knowledge of these events, the record indicates that others, including Lois Normandin, Audrey Diefenbach, and David Chubb, were present inside the home at some point during the victim's detention and subsequent beating. Although these individuals apparently had knowledge of such events, but were not criminally charged, we decline to exonerate Jaffray for secret confinement kidnapping on account of an exercise of prosecutorial discretion not to prosecute potential accomplices. Thus, except where otherwise noted, our reference herein to "third persons" pertains only to those individuals who were outside the home when the victim was moved to the basement and beaten to death.

the Normandin house "bound and gagged." The police then attempted to search the Normandin home, but were denied entrance for approximately twenty minutes.[16] They eventually entered the home, but did not find Williams after a brief inspection.

Thereafter, at approximately 12:55 P.M., the police were again summoned to the Normandin home. After talking with the victim's mother, Ruth McClinton, the officers attempted to reenter the home, but again met resistance. Eventually, the officers gained access to the home and found Williams' plastic-wrapped body in the basement.

Following a bench trial, the trial judge acquitted Martin Normandin, but found Jaffray and Ronald Normandin guilty of kidnapping as charged. With respect to Jaffray and Ronald, the court specifically found "beyond a reasonable doubt that the victim Bruce Williams was forcibly confined or imprisoned . . . that during the course of said confinement the Defendants [Jaffray and Ronald Normandin] kept the location of the victim secret . . . [and] that the two Defendants . . . intended the confinement to be secret."

---

[16] Detroit Police Officer David Mitchell testified:

*Q.* You knocked on the door. Did Mr. Normandin answer the door?
*A.* Him and a few other people came from the back of the house. There were several people outside at the time.

\* \* \*

*Q.* . . . What did Mr. Martin Normandin tell you at the door?
*A.* They denied us entry in the home, stated his mother was sick and he doesn't want us to disturb her coming into the house.

\* \* \*

*A.* We stood by for another say 15, 20 minutes making sure no one left the house, and we gained access to the house.

In his appeal in the Court of Appeals, defendant Jaffray argued, inter alia, that the evidence was insufficient to support a conviction of secret confinement kidnapping. The panel agreed and reversed his conviction. We then granted the prosecutor's application for leave to appeal. 442 Mich 935 (1993).

## II

In determining whether sufficient evidence has been presented to sustain a conviction, an appellate court is required to view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v Hampton,* 407 Mich 354, 368; 285 NW2d 284 (1979), cert den 449 US 885 (1980). See also *Jackson v Virginia,* 443 US 307; 99 S Ct 2781; 61 L Ed 2d 560 (1979), and *People v Wolfe,* 440 Mich 508, 515; 489 NW2d 748 (1992).

The elements of the offense of "kidnapping" are not easily set forth in a short, simple statement. As Justice BOYLE, writing for this Court, explained in *People v Wesley,* 421 Mich 375; 365 NW2d 692 (1984), Michigan's kidnapping statute[17] encompas-

---

[17] MCL 750.349; MSA 28.581 provides:

Any person who wilfully, maliciously and without lawful authority shall forcibly or secretly confine or imprison any other person within this state against his will, or shall forcibly carry or send such person out of this state, or shall forcibly seize or confine, or shall inveigle or kidnap any other person with intent to extort money or other valuable thing thereby or with intent either to cause such person to be secretly confined or imprisoned in this state against his will, or in any way held to service against his will, shall be guilty of a felony, punishable by imprisonment in the state prison for life or for any term of years.

ses six forms of conduct, each of which constitutes the crime of kidnapping. There the Court said,

[A] person can be convicted of kidnapping if it is proven beyond a reasonable doubt that he or she wilfully, maliciously, and without lawful authority,

(a) forcibly or secretly confined or imprisoned any other person within this state against his will, or

(b) forcibly carried or sent such person out of this state, or

(c) forcibly seized or confined, or inveigled or kidnapped any other person

(1) with intent to extort money or other valuable thing thereby, or

(2) with intent either

(A) to cause such person to be secretly confined or imprisoned in this state against his will, or

(B) [to cause such person to be] in any way held to service against his will. [*Wesley, supra,* p 383.]

Although this articulation may appear to enumerate only five forms of kidnapping, the Court further explained:

The portion of the statute contained in (a) above actually contains two separate descriptions of punishable conduct: forcible confinement or imprisonment and secret confinement or imprisonment. [*Id.,* p 384.]

At issue in *Wesley* was whether the specific intent portion of the statute "applies to *all* of the forms of conduct which precede it or applies only to the form of conduct which immediately precedes it, i.e., 'forcibly seize or confine, . . . or inveigle or kidnap.' " *Id.,* p 383 (emphasis in original). The *Wesley* Court concluded that "the 'intent section' of the statute applies only to the form of conduct

which immediately precedes it,"[18] and, therefore, does not apply to that portion of the statute which prohibits any person from "forcibly or secretly confin[ing] or imprison[ing] any other person within this state against his will. . . ."[19] In other words, three of the six formulations of kidnapping within the Michigan statute do not require a showing of specific intent:

(1) forcible confinement or imprisonment of another within this state;

(2) secret confinement or imprisonment of another within this state; or

(3) forcible carrying or sending of another out of this state.

This important distinction in the statutory framework comports with the judicial purpose of deterring prosecutorial overcharging in connection with the kidnapping statute. *People v Otis Adams,* 34 Mich App 546; 192 NW2d 19 (1971) (opinion of LEVIN, J.). Although "asportation" is not mentioned in the statute, asportation of the victim is a judicially required element of the crime of "kidnapping by forcible confinement or imprisonment," having been read into the statute to sustain its constitutionality by distinguishing true kidnapping from common-law false imprisonment and other lesser crimes. *People v Adams,* 389 Mich 222; 205 NW2d 415 (1973).[20]

---

[18] *Wesley, supra,* p 383.

[19] MCL 750.349; MSA 28.581.

[20] See *Wesley, supra,* pp 384-385. See also *People v Otis Adams, supra,* p 560 wherein Justice LEVIN wrote: "It is obvious that virtually any assault, any battery, any rape, or any robbery involves some 'intentional confinement' of the person of the victim. To read the kidnapping statute literally is to convert a misdemeanor, for example, assault and battery, into a capital offense. A literal reading of the kidnapping statute would permit a prosecutor to aggravate the

However, a showing of asportation is not required where the accused is charged with either secret confinement of the victim or forcible confinement with intent to secretly confine the victim. As this Court explained in *Wesley,* "no movement is required *where the victim was secretly confined,* Perkins [Criminal Law (2d ed)], p 178." *Wesley, supra,* p 388 (emphasis added).[21] Alternatively, where "forcible confinement with intent to secretly confine" is the crime, the

> specific intent requirement obviates the need to read an asportation element into the statute. The intent to cause the victim to be secretly confined substitutes for the requirement of asportation. See Perkins, Criminal Law (2d ed), p 178. [*Wesley, supra,* p 390.]

In the case before us, we note that although the trial court specifically found that the location of the confinement was kept secret and that defendant Jaffray intended the confinement to be secret, the trial judge made no finding concerning the element of asportation.[22] Thus, we draw from the

charges against any assailant, robber, or rapist by charging the literal violation of the kidnapping statute which must inevitably accompany each of those offenses."

[21] See also *People v Phillips,* 112 Mich App 98, 109; 315 NW2d 868 (1982) ("It would appear that 'secret confinement' can be the alternative to 'asportation' ").

[22] While the trial court made no finding with respect to asportation, a review of the record suggests that a rational trier of fact could have found beyond a reasonable doubt the existence of the element of asportation. Defendant Jaffray admitted his participation in the forcible confinement of Williams, the victim, against his will, and that he, Jaffray, sought to confine the victim until Ronald's dog could be recovered. Jaffray also admitted that he participated in forcibly moving the victim from the living room into the basement where he tied the victim to a pole. In light of the surrounding circumstances, we believe this movement of the victim constituted asportation. Moreover, because the purpose of the victim's confinement was to recover the missing dog, this asportation was "incidental to the commission of the kidnapping," not "incidental to the commission of a lesser underlying crime . . . ." See *Adams,* 389 Mich 236.

*Wesley* analysis two formulations of proscribed conduct that have possible application in this case. We refer to conduct

> (1) where the perpetrator confines or imprisons the victim secretly against his will (secret confinement kidnapping);[23] and
> (2) where the perpetrator forcibly seizes or confines the victim against his will with the intent to cause the victim to be secretly confined (forcible confinement with intent to secretly confine).[24]

Despite the clear dichotomy between these two formulations of kidnapping, the Court of Appeals in the case at bar misinterpreted *Wesley* as requiring a showing of secret confinement *and* a showing of specific intent to secretly confine the victim in every case in which kidnapping by secret confinement is alleged.[25] This is contrary to the *Wesley* explanation that a kidnapping conviction may be premised on a showing of confinement that in fact is secret *or* upon a showing of forcible seizure or

---

[23] *Wesley, supra,* pp 384-388.

[24] *Id.,* pp 389-391.

[25] Specifically, the Court of Appeals stated:

In *People v Wesley,* 421 Mich 375, 383; 365 NW2d 692 (1984), sets [sic] forth the elements of this statute:
"[A] person can be convicted of kidnapping if it is proven beyond a reasonable doubt that he or she wilfully, maliciously, and without lawful authority,
"(a) forcibly or secretly confined or imprisoned any other person within this state against his will . . .

* * *

"(2) with intent either
"(A) to cause such person to be secretly confined or imprisoned in this state against his will . . . ." [Note 4 *supra,* slip op, p 2. Alteration in original.]

confinement with intent to secretly confine, whether or not the confinement remains a secret.

With that clarification in mind, we turn to the task of determining whether sufficient evidence was produced in this case to support a finding of defendant's guilt of either of these two types of kidnapping. To this end, we shall first consider whether there was sufficient evidence of "forcible confinement with intent to secretly confine," and then we shall examine the evidence tending to establish guilt of "secret confinement kidnapping." Because we find sufficient evidence of either, and both, types of kidnapping, we conclude that the Court of Appeals erred, and that reversal is required.[26]

III

A

To convict an accused of "forcible confinement

[26] Our decision is consistent with *People v Bergevin*, 406 Mich 307, 311-312; 279 NW2d 528 (1979), in which this Court held that each statutory formulation of kidnapping does not constitute a separate and distinct crime for purposes of trial, conviction, and sentencing. Rather, "the intent of the Legislature [was] to delineate within the statute the possible alternative ways in which the crime of kidnapping could be committed." *Id.,* p 311. Thus,

> [t]he fact that a defendant abducts a victim under circumstances which satisfy more than one of the alternative definitions of [kidnapping] does not preclude a prosecutor from listing in an information the alternative circumstantial bases in a kidnapping charge or from arguing all of the alternative circumstantial bases upon which a jury can return a verdict of guilty or not guilty, but it may give rise to only one criminal charge for purposes of trial, conviction, and sentencing. [*Id.,* p 312.]

Likewise, although Jaffray's abduction of Williams may give rise to only one criminal kidnapping conviction, we believe his conviction could be supported by the factual existence of the alternative formulations of kidnapping by secret confinement or kidnapping by forcible confinement with intent to secretly confine.

with intent to secretly confine," the prosecution must prove:

(1) a forcible seizure, confinement, inveigling or kidnapping of another,

(2) done wilfully, maliciously and without lawful authority,

(3) with the intent to cause such person to be secretly confined or imprisoned within the state against his will. [*Wesley, supra*, p 389.][27]

---

[27] We recognize that the information charged that defendant Jaffray "forcibly or secretly confined" the victim contrary to the kidnapping statute and did not specifically allege "with intent to secretly confine." However, on the authority of *People v Adams, supra*, we conclude that the information sufficiently encompassed the charge of "forcible confinement with intent to secretly confine." In *Adams*, which addressed the sufficiency of an information in a kidnapping case, this Court quoted with approval from *People v Weiss*, 252 AD 463, 467-468; 300 NYS 249 (1937), rev'd on other grounds 276 NY 384 (1938):

"In determining the sufficiency of an indictment the test is: Does it identify the charge against the defendant so that his conviction or acquittal will bar a subsequent charge for the same offense; does it notify him of the nature and character of the crime with which he is charged so as to enable him to prepare his defense and to permit the court to pronounce judgment according to the right of the case? In applying this test courts should be liberal, not technical." [*Adams*, 389 Mich 243. Emphasis deleted; citations omitted.]

In *Weiss*, the highest New York appellate court considered a challenge to an indictment for kidnapping that did not allege specific intent even though the New York statute defined kidnapping as the wilful and unlawful seizing of a person against his will "with the intent to cause him to be confined." The court found the indictment to be sufficient and explained:

The statute requires seizure with intent to confine. Seizure alone is not sufficient. But where seizure and actual confinement against the victim's will and without authority of law are alleged, the unlawful intent appears, it is implicit in the indictment, and the crime defined by the statute is sufficiently pleaded . . . . [*Weiss*, 252 AD 467.]

In *Adams*, the information charged forcible confinement, but did not allege asportation. Applying the *Weiss* test, the *Adams* Court found the information sufficient and reasoned, "Defendant knew of

Defendant Jaffray does not dispute the existence of the first two elements,[28] but asserts that he "did not hide what was going on." However, our review of the record indicates that a rational trier of fact could find beyond a reasonable doubt that Jaffray intended to secretly confine the victim.

Proof of Jaffray's intent can be established inferentially on the basis of his conduct during the morning in question. *People v Love,* 127 Mich App 596; 339 NW2d 493 (1983). As already noted, Jaffray provided a detailed account of his involvement in Williams' confinement in a statement to police, which was admitted in evidence.

In his statement, Jaffray acknowledged that he actively participated in the initial confinement of Williams, binding his hand-cuffed wrists and feet with a cord. Although Williams offered to help in the first search for the dog, Jaffray denied his request and guarded Williams while a codefendant set out to recover the missing dog in Jaffray's car. A reasonable inference can be drawn that the purpose of Jaffray's decision to guard the shackled victim in the living room of the home was to deny Williams the opportunity to alert others of his predicament.

The manifestation of Jaffray's intent is further evidenced by his response to the first unsuccessful search by a codefendant. Again, in lieu of allowing

the nature and character of the crime he was charged with. If the Court of Appeals' reversal of conviction is affirmed by this Court, he will not be able to be again charged with this crime of kidnapping." *Id.,* p 244.

In the case before us, Jaffray affirmatively argued that he lacked the intent to secretly confine the victim. In light of *Adams,* we are satisfied that the notice provided in the information was adequate to sustain a conviction of forcible confinement with intent to secretly confine, and that Jaffray's conviction or acquittal would bar any subsequent kidnapping charge based upon the same transaction.

[28] Indeed, Jaffray acknowledges in his brief to this Court that "it can be said that there was an involuntary confinement in this matter, and that the motives of the confinement were improper . . . ."

Williams to help in the second search for the dog, Jaffray and a codefendant departed while, at Jaffray's suggestion, the other codefendant stayed behind to guard Williams. It could be reasonably inferred that Jaffray would not allow Williams, the only person who knew the precise location of the dog, to assist in the search because he wanted to maintain the secrecy of Williams' confinement.

The strongest evidence of Jaffray's intent to secretly confine the victim was provided by the action he took when he learned of efforts by Williams to alert others. As Jaffray admitted in his statement, upon returning to the home after the second unsuccessful effort to retrieve the dog, Mrs. Lois Normandin informed the codefendants that Williams had been "making a lot of noise." Jaffray's response was to join a codefendant in moving Williams to the basement, where Jaffray tied the victim to a pole and "gagged" his mouth. Clearly, this action was taken by Jaffray to prevent Williams from communicating his plight to others, in an effort to preserve the secrecy of the confinement.

Defendant Jaffray points to Ronald Normandin's disclosure to Kennedy as evidence that there was a lack of secrecy. However, that action by Ronald is not material to the issue of Jaffray's intent in the absence of knowledge by Jaffray that such a disclosure had been made. In his statement to police, Jaffray made clear that he was unaware of the fact that Ronald had informed Kennedy of Williams' plight.[29] Even if one were to conclude that

---

[29] Jaffray acknowledged in his statement to the police:

> _____ told the lady across the street two sons, Steve and Carl, Minnie's boy. [sic] That we had Bruce in the house tied up. That we were trying to get information from him about the dog. I guess _____ thought that he could trust them or something, I don't know. . . . *I didn't know that _____ had told them that.* [Emphasis added.]

Ronald did not intend to secretly confine Williams, the same could not be said of Jaffray.

We find that the evidence produced was sufficient to support a finding beyond a reasonable doubt by a rational factfinder that defendant Jaffray forcibly seized or confined Williams with the intent to secretly confine him.

B

To be guilty of secret confinement kidnapping, an accused must:

1. Willfully, maliciously, and without legal authority[,]
2. Secretly confine or imprison another person[,]
3. By force/without consent. [12 Michigan Practice, Criminal Law, § 9.16, p 283.][30]

Given the facts of this case, our analysis of the application of this form of kidnapping necessarily focuses on the knowledge of third persons regarding the victim's plight and its effect on the element of secret confinement. Defendant asserts that secret confinement kidnapping cannot be established unless the victim is placed in a situation in which his location will not be discovered within a reasonable period of time, citing *People v Johnson,* 171 Mich App 801; 430 NW2d 828 (1988), *People v McNeal,* 152 Mich App 404; 393 NW2d 907 (1986),

---

[30] Professor Saltzman notes that "[w]here the victim is isolated from others, by physical force or threat of physical harm, courts have easily found sufficient evidence to sustain a finding of secret confinement." 12 Michigan Practice, p 284. As noted above, this type of kidnapping does not require a specific intent to secretly confine under the authority of *Wesley.* See also *People v Nodine,* 36 Mich App 80, 84; 193 NW2d 172 (1971).

Thus, the critical factor peculiar to this form of the statutorily proscribed behavior is the degree of the victim's isolation as a result of the accused's conduct, not the specific intent of the accused.

and *People v Lucille Walker,* 135 Mich App 311, 325-326; 355 NW2d 385 (1984).

Defendant Jaffray contends that the element of secret confinement was not established in this case because others outside the group living at the Normandin house learned from one of the perpetrators that Williams, the victim, was being detained in the upstairs portion of the house. We disagree.

As we read the kidnapping statute in the light of *Wesley* and its progeny, mere awareness by a third party of the victim's plight is not dispositive. In some situations, other factors must be taken into account in determining whether the conduct of an accused constitutes secret confinement kidnapping. In *People v Lucille Walker, supra,* our Court of Appeals quoted with approval the Missouri Supreme Court, which construed a similar kidnapping statute and stated:

> "Secret confinement, within the meaning of § 559.240, does not require proof of total concealment and complete isolation whereby the victim is rendered invisible to the entire world. It is sufficient to show that the person kidnapped has been effectively confined against his will in such a manner that he is prevented from communicating his situation to others and accused's intention to keep the victim's predicament secret is made manifest." *State v Weir,* 506 SW2d 437, 440 (Mo, 1974). [*Id.,* pp 325-326.]

The *Lucille Walker* panel considered the plight of a number of elderly women allegedly held secretly against their will,[31] and stated:

---

[31] In *Lucille Walker,* the defendants allegedly engaged in a scheme of manipulating elderly women through the operation of an " 'adult congregate living facility' " in Miami, Florida. After the women moved into the facility and paid rent, the defendants allegedly ex-

These women were not forcibly seized and re-
moved to a hiding place for the purpose of extor-
tion. They were transported openly in tourist class
seats on a Delta Airlines flight which was filled to
capacity from Miami via Ft. Lauderdale to Detroit
Metropolitan Airport. They exited through a pub-
lic terminal. . . . The ladies admitted that while
at the house [in Michigan] they saw, but did not
complain to, an attorney, a bank clerk, two plumb-
ers, a gas company meter man, and two
handymen. . . . *There were many windows to the
world open to [the victims]. [Id., pp 324-325. Em-
phasis added.]*

As the final sentence suggests, in cases dealing
with secret confinement kidnapping, a proper fo-
cus is on the channels of communication available
to the victim. Although a third person may have
suspicions or even knowledge concerning a confine-
ment, unless he is aware of the specific location of
the victim, the victim may be deprived of the
ability to communicate his plight to others.[32] In
other words, absolute, prolonged secrecy is not
always required to sustain the charge; it is enough
that secrecy, or the attempt to maintain secrecy,
denied the victim the opportunity to avail himself
of outside help.

---

ploited their infirmity by transferring them to another home owned
by the defendants in Oak Park, Michigan. *Id.,* p 313.

While acknowledging that the defendants may have been guilty of
other crimes, the Court reversed their kidnapping convictions, "de-
clin[ing] to construe secret confinement so broadly as to include an
occurance [sic] *in the presence and in the view of so many witnesses*
as were present and testified in this case." *Id.,* p 326 (emphasis added).
Thus, the *Lucille Walker* panel refused to expand the concept of
secret confinement to include a situation in which the victims could
have easily communicated the existence of their nonconsensual deten-
tion to others. We find *Lucille Walker* easily distinguishable from the
case now before us.

[32] In *Johnson, supra,* pp 806-807, relied upon by defendant, the
Court of Appeals acknowledged that "a person is being secretly
confined if he is being held against his will at a location and there are
no third persons who are aware of the confinement or, *even if aware,
who know the location of the confinement* . . . ." (Emphasis added.)

In *McNeal, supra,* p 412, the Court of Appeals stated:

> There is very little case law in Michigan to indicate what constitutes "secret confinement." . . . One thing is obvious. "Secret" confinement is to be distinguished from confinement in a public place such as a jail or a mental institution. . . . In general, we believe that secret confinement is confinement in a place or manner which makes it unlikely that members of the public will know or learn of the victim's unwilling confinement within a reasonable period of time. Moreover, in order to establish secret "confinement" or "imprisonment," some significant type or amount of detention may be required.

Although this explanation by the *McNeal* panel is instructive, we find it too narrow to be useful as a standard for all cases in which secret confinement is charged. For example, we disagree with the *McNeal* articulation to the extent it can be read to limit secret confinement kidnapping to those situations in which it is unlikely that members of the public will learn of the victim's unwilling confinement within a reasonable period of time. There are other factual scenarios that constitute secret confinement which fall outside the *McNeal* parameters, as where the *confinement* is known by third parties but the *location* of confinement is unknown to others. See *Johnson, supra,* pp 806-807.

Other jurisdictions have adopted the concept that secret confinement does not require a showing of complete isolation of the victim, free from any knowledge by others of the detention.[33] For example, in *People v Mulcahey,* 72 Ill 2d 282; 381 NE2d

[33] See also Perkins & Boyce, Criminal Law (3d ed), p 233 ("Total concealment is not required").

254 (1978), the Illinois Supreme Court concluded that "the secret confinement contemplated by the statute may be shown by proof of the secrecy of both the confinement and place of confinement, *or of either.*" *Id.,* p 285 (emphasis added).[34]

As we read Michigan's kidnapping statute in light of the authorities, we conclude that the essence of "secret confinement" as contemplated by the statute is deprivation of the assistance of others by virtue of the victim's inability to communicate his predicament. "Secret confinement" is not predicated solely on the existence or nonexistence of a single factor. Rather, consideration of the totality of the circumstances is required when determining whether the confinement itself or the location of confinement was secret, thereby depriving the victim of the assistance of others. That others may be suspicious or aware of the confinement is relevant to the determination, but is not always dispositive.

Applying these principles to the evidence adduced at trial, we are convinced that a rational

---

[34] See also *Wilkes v State,* 182 So 2d 480, 482 (Fla App, 1966) ("Defendant contends that the verbiage 'secretly confined' as set out in the statute must be construed to mean that no one else knows where the person abducted is to be carried, and since one of these boys knew where these girls had been taken, such fact dissipates the accusation. We conclude that such a construction would be contrary to the intent of the cited statute. It may well be that the boy knew that these two girls were located in a deserted fishing camp and were being held against their will in some isolated area, but such knowledge does not conform with the conclusion that they were not secretly confined"); *State v Randall,* 137 Mont 534, 539; 353 P2d 1054 (1960) ("To 'secretly' confine within the meaning of our statute means confinement against the will of the person confined which deprives him of the friendly assistance of the law to redeem himself from captivity"); *People v Ehinger,* 152 AD2d 97, 101; 547 NYS2d 302 (1989) ("Surely, this jury was free to find that the isolation of a Japanese music student, with few local friends or acquaintances, could be most effectively accomplished by imprisonment in his own home in the very manner carried out by defendants. Indeed, defendants were successful in fobbing off the police on their first visit to the door of the apartment when the officers were summoned to the premises by an alarmed neighbor").

trier of fact could have found defendant guilty beyond a reasonable doubt of secret confinement kidnapping. After Williams confessed to selling the dog and informed the codefendants of its location, Jaffray bound Williams with handcuffs and a rope, rendering the victim immobile. Jaffray then refused to allow Williams to participate in two subsequent searches for the dog, where Williams would have been visible to the outside world. Instead, Williams remained shackled on the living room floor, while either Jaffray or a codefendant kept guard. Throughout the duration of this episode, the victim's confinement was a secret to everyone outside the Normandin home.

When Ronald Normandin disclosed to Curtis Kennedy that Williams was "dog-tied" upstairs, and Kennedy allegedly heard Williams upstairs screaming for help, the veil of secrecy was temporarily fractured, but it was not completely destroyed. After Kennedy returned to his home, he received no further information regarding Williams' plight or location.[35] Further, unbeknown to Kennedy or anyone else outside the Normandin home, Jaffray and a codefendant subsequently

---

[35] Kennedy further testified:

> *Q.* Did you go back over to see them?
> *A.* No, I didn't.
> *Q.* Did you hear your friend any more when you were by your mother's house?
> *A.* No, I didn't.

The record indicates that Minnie Collins, Kennedy's mother, was the only person to receive further information regarding the whereabouts of Williams. She testified that after her son informed her of his discovery, she saw Martin Normandin on the street, and she warned him to release Williams or she would call the police. Collins testified that Martin went back into the Normandin home, then returned outside and stated that Williams had gone to a neighbor's house, about a block away. Other than Ronald Normandin's disclosure to Kennedy, no one outside the home received any information regarding Williams' confinement in the Normandin residence while the victim was still alive.

moved the victim to the basement, clearly an area of greater isolation. Jaffray then "gagged" Williams to prevent him from screaming for help.

After Williams was moved to the basement and gagged, the occupants of the Normandin home engaged in a concerted effort to maintain the secrecy of Williams' location.[36] In the light of this conduct on the part of Jaffray and the fact that the occupants of the home, including Jaffray, refused to divulge the location of the decedent after he was moved to the basement, a rational trier of fact could conclude that Williams' confinement in the basement was secret.

---

[36] Minnie Collins testified as follows:

> *Q.* Who answered the door?
> *A.* Lois [Normandin] answered the door.
> *Q.* And you are telling us she wouldn't let the police in?
> *A. At first she told them that he wasn't there. That he had left.* And they asked could they come in. They went in and they came right out and said they didn't see anything. [Emphasis added.]

Officer David Mitchell of the Detroit Police Department testified as follows:

> *Q.* Now, did you look around that home at that time?
> *A.* Yes, I checked the upstairs rooms of the home.
> *Q.* Did you see anybody upstairs?
> *A. There were a few people in the bedroom asleep laying in the bed, but we didn't find what we were looking for upstairs.* [Emphasis added.]

Further, Officer Richard Hudson of the Detroit Police Department testified as follows:

> *Q.* (By Mr. Less, continuing): Did you go down the basement yourself, or were you with someone the first time?
> *A.* I was with someone the first time, Marty [Normandin].
>
> *   *   *
>
> *Q.* Did he say anything when you went down the basement to you?
> *A.* Idle chitchat, nothing important.

As noted in *Johnson, supra,* p 807:

> [W]e believe that one could be secretly confined in the perpetrator's own home even though, once suspicion fell upon the perpetrator, one of the first logical places to look would be his home.

Like the *Johnson* Court, we believe Williams could be, and was, secretly confined in the perpetrators' home[37] even though, once suspicion fell upon the defendants, Minnie Collins summoned the police to the defendants' home. Despite the fact that Kennedy and his mother were aware that Williams was being held against his will, they were not aware of the location of his confinement in the basement. Indeed, Kennedy believed that Williams was confined in the top floor of the three-level home. If Jaffray and a codefendant had not moved Williams to the basement, he might have been able to summon outside help before being bludgeoned with the nail-studded bat.

We also reject Jaffray's argument that, on the basis of *McNeal, supra,* a secret confinement did not occur here because a disinterested person learned of the confinement within a reasonable period of time. Essentially, he asserts that the duration of the confinement was insufficient to establish the element of secrecy. We disagree.

While the duration of the confinement is certainly relevant, as already indicated, we reiterate that "secret confinement" is not predicated upon a single factor. In this case, there is no doubt that the victim, throughout the period of his confine-

---

[37] The fact that Williams also lived in the home with the defendants is of no significance in assessing defendant's guilt; a victim can be a "prisoner in his own castle" for purposes of the kidnapping statute. See also *People v Mulcahey, supra,* p 285 ("The victim in this case was 'secretly confined' as effectively in her own home as if defendant had asported her to some remote isolated place of confinement").

ment in the basement, was effectively precluded from communicating his plight or location to others.

Although the duration of Williams' confinement in the basement before his death is not precisely fixed by the evidence, the record makes clear beyond doubt that the fatal beating did not occur immediately following his removal to the basement.[38] Under the circumstances, we are satisfied

---

[38] In Ronald Normandin's redacted statement, he recalled:

> So, then we all went upstairs, and left Bruce in the basement. So, _____ wanted to clean up, before we went back over there to get the dog. So, that's when Audry [sic] [Diefenbach] woke up. Audrey was coming downstairs. _____ was in the bathroom. I was upstairs, and I believe that _____ was in the livingroom. [sic] My mom had woken up, and she and Audrey were sitting in the kitchen. . . . So, I came down and I was telling them what was going on. . . . Frank [Hamilton] and David Chubb, came in the side door. They had gone to the store, to get some wine. . . . They came in, and started to drink the wine . . . . Frank was asking where Bruce was. I told him, that Bruce was in the basement. Frank got a few drinks in him. Then, Frank started pointing to the scar on his head. He said, you see this. He started mumbling something like, he was going to kill him. . . . He kept mumbling about what Bruce had done to him in the past. So, I told Frank, just leave Bruce alone . . . . And, Frank didn't say nothing. He just walked away, and I went back upstair[s] . . . . That's when we both heard Audrey yelling for _____ . . . . So, _____ ran down the basement . . . and I was . . . right behind him. . . . It was already to [sic] late. Frank had already smacked Bruce in the head . . . .

Further evidence that Williams was not beaten immediately after his removal to the basement can be gleaned from the testimony of Audrey Diefenbach. Diefenbach did not recall seeing or hearing the victim on the morning in question. However, she further testified that after waking that morning, she went to the kitchen, which apparently adjoined the basement stairs. While in the kitchen, Diefenbach began preparing breakfast. Jaffray and Ronald then arrived in an automobile and entered the kitchen through a side door. After engaging in a brief conversation with Jaffray, Diefenbach began eating breakfast, which apparently consisted of eggs.

Diefenbach testified that while she was eating, Hamilton came into the kitchen with a baseball bat on his shoulder and continued into the basement. After having an "uneasy feeling" and hearing "some

that a rational trier of fact could find beyond a reasonable doubt that Williams was secretly confined in the basement.

IV

We conclude that there was sufficient evidence to justify a finding beyond a reasonable doubt by a rational trier of fact that defendant was guilty either of kidnapping by forcible confinement with intent to secretly confine or of kidnapping by secret confinement. Therefore, we reverse the decision of the Court of Appeals and remand this case to that Court for consideration of defendant Jaffray's remaining arguments on appeal.

CAVANAGH, C.J., and BRICKLEY and MALLETT, JJ., concurred with GRIFFIN, J.

BOYLE, J. (*concurring*). I agree with Justice GRIFFIN's result and much of his rationale. I write separately first to observe that I do not agree with Justice LEVIN's description of the majority opinion. Specifically, I do not agree that the majority "concedes" that the veil of secrecy was fractured. Cf. separate opinion of LEVIN, J., p 322, n 16. Justice LEVIN's characterization implies that the majority and separate opinions diverge because the majority finds a partial fracture as a matter of law.

This appeal raises only an issue regarding sufficiency of the evidence of secret confinement. The defendant did not challenge the sufficiency of the evidence on the basis of the duration of the confinement for obvious reasons; the confinement oc-

noises downstairs," Diefenbach went upstairs to the bedroom. Thus, although Diefenbach never saw the victim that morning, Williams apparently had been moved to the basement before Diefenbach awoke, where he remained bound and gagged while she prepared and ate breakfast.

curred over the course of several hours. I read the majority opinion to hold that the evidence of secret confinement was sufficient, not to agree that there are artificial parsing points in the continuity of activity, past which secret confinement must be reestablished.

For the same reason, this is not an appropriate vehicle for either the majority or the separate opinion to address in dicta unraised issues regarding length of confinement.[1] The defendant did not argue before the trial court or in his brief to this Court that evidence of the length of confinement in the basement was insufficient.

Further, although the separate opinion does not indicate how this case should be decided, to the extent that it implies that the incident was no more than a relatively "minor confinement," I strongly disagree.[2] The defendant aided and abetted in a course of conduct so extreme in relation to its provocation that common sense suggests that it was likely to end, as it did, in someone's death. Indeed, it would appear that the Model Penal Code would permit a conviction of the most serious degree of kidnapping on the evidence presented. Model Penal Code, § 212.1(c) (quoted *post* at 324, n 20).

Finally, as the trial judge observed, there was no evidence that defendant Jaffray said anything to anybody about where the victim was, nor was there a "[b]illboard saying who is being held . . . ." If, as defendant Jaffray himself observed, the victim's screams are heard by those whom the captor can trust not to call the police, is

---

[1] The fact that the focus of the trial and appeal was on the entire length of confinement in the house accounts for the fact that the record does not reflect the length of time the victim was confined in the basement.

[2] The prosecutor has not "conceded" that the defendant did not intend to cause physical harm to the victim.

the confinement still secret? Such observations simply underscore the fact that speculation regarding the "absurd results" of "relatively minor confinements" is without empirical support in this record or the thousands of cases this Court has reviewed in the decade since the decision in *People v Wesley,* 421 Mich 375; 365 NW2d 692 (1984). *Post* at 324.

Riley, J., concurred with Boyle, J.

Levin, J. (*separate opinion*). Jaffray was convicted of kidnapping for "forcibly or secretly confin[ing]" Bruce Williams and for "forcibly seiz[ing] or confin[ing]" him with intent to cause Williams "to be secretly confined or imprisoned."[1]

The penalty for kidnapping is imprisonment in the state prison for life or for any term of years.

The prosecutor asserts that the crime of kidnapping was committed at the moment Bruce Williams was seized, handcuffed and his feet were tied.

The prosecutor has, in effect, conceded that there is no evidence that Jaffray intended to cause physical harm to Williams.[2]

I question whether the Legislature intended to

---

[1] Kidnapping is proscribed and defined in § 349 of the Penal Code:

> Any person who wilfully, maliciously and without lawful authority shall forcibly or secretly confine or imprison any other person within this state against his will, or shall forcibly carry or send such person out of this state, or shall forcibly seize or confine, or shall inveigle or kidnap any other person with intent to extort money or other valuable thing thereby or with intent either to cause such person to be secretly confined or imprisoned in this state against his will, or in any way held to service against his will, shall be guilty of a felony, punishable by imprisonment in the state prison for life or for any term of years. [MCL 750.349; MSA 28.581.]

[2] See part V(B).

make secret confinement a capital offense where, although the manner or length of confinement may not have been insignificant, there was evidence only of an intent *to confine* and *no* evidence of an intent to harm the victim or hold the victim as a hostage for ransom or other felonious purpose. In the instant case, the purpose of the confinement was to recover a dog that had been stolen by the victim.

I

I am concerned that the majority opinion in the instant case, and this Court's opinion in *People v Wesley,* 421 Mich 375; 365 NW2d 692 (1984), may be read to permit charging a defendant with kidnapping *and* an underlying felony whenever the underlying felony involves an element of confinement, and to permit transforming a simple assault or false imprisonment into kidnapping.

Because the majority adopts the *Wesley* view that " 'no movement is required where the victim was secretly confined,' "[3] an offender might be charged with *both* kidnapping and another underlying crime that involves an element of confinement in any situation in which the underlying crime was committed in a private or secret place. Thus, a stairwell robbery in which the victim was confined might now be kidnapping *and* robbery as long as the victim was unable to communicate his plight to the outside world during the duration of the robbery. Similarly, a nighttime sexual assault in which the victim is wrestled to the ground and rendered unable to call for help might be both kidnapping and sexual assault.

The majority's approach might facilitate the avoidance of the strictures of *People v Adams,* 389

[3] *Ante,* p 299.

Mich 222; 205 NW2d 415 (1973), aff'g 34 Mich App
546, 550; 192 NW2d 19 (1971),[4] simply by substitut-
ing a charge of secret confinement kidnapping,
rather than forcible confinement kidnapping,
along with the underlying felony.

The majority opinion could be read to allow a
trier of fact to convict a defendant of secret con-
finement kidnapping where the offender's actions
are closer to the common-law offense of simple
assault than to the capital offense of kidnapping.

The majority does not construe the kidnapping
statute as requiring a "significant type or amount
of detention," as did the Court of Appeals in
*People v McNeal,* 152 Mich App 404, 412; 393
NW2d 907 (1986). Thus, any detention in which
the victim is unable to communicate his plight to
the outside world might now constitute kidnap-
ping. Under the majority's approach, a frustrated
worker might be said to have committed secret
confinement kidnapping if he blocks the door of
the office restroom and says to another employee
who had already entered something like "let's
settle our disagreement once and for all. We're not
going anywhere until we work this thing out."
Clearly, there is a distinction between the behav-
ior of the frustrated worker and a criminal who,
after forcibly seizing his victim, secretly binds and
gags that person. Yet, it appears that under the
majority's approach both the frustrated worker
and the criminal have each committed the same
offense.[5]

---

[4]  Our kidnapping statute, like most, is so all-encompassing in
its literal breadth that unless its operative effect is confined by
objective standards it would be void for overbreadth.

   Where a kidnapping statute does not in terms require a
"carrying away" of the victim, an asportation requirement or,
as a substitute, the element of secrecy, has been judicially read
into and made a part of the definition of the crime.

[5] The majority states that "consideration of the totality of the

I believe that, just as this and other courts have read an asportation requirement into the forcible confinement portion of the kidnapping statute to remedy that provision's potential overbreadth, it might be necessary to construe the secret confinement provision of the kidnapping statute as requiring some significant manner or length of detention. Otherwise, defendants might be convicted of "true kidnapping" when they have merely committed false imprisonment.[6]

## II

When the Penal Code was enacted in 1931,[7] a sentence of life imprisonment or for any term of years[8] could only be imposed where an *assault* was

circumstances is required when determining whether the confinement itself or the location of confinement was secret, thereby depriving the victim of the assistance of others," *ante,* p 309, and it states that " 'secret confinement' is not predicated upon a single factor." *Ante,* p 312. While the majority takes a flexible approach to the question whether the confinement was in fact secret, it does not seem willing to take into account the totality of the circumstances when considering whether a given confinement, even if secret, can truly be said to constitute the capital offense of secret confinement kidnapping.

[6] For the same reason, it might be necessary to construe the "seizure or confinement with the intent to secretly confine" provision of the kidnapping statute as requiring an intent to confine for a significant time or in a significant manner. Such a construction of the statute would prevent convictions for kidnapping where a defendant seized or confined his victim with the intent to secretly confine the victim for a very short period of time or in a relatively nonthreatening or harmful manner.

[7] Years before, laws were enacted providing for lengthy mandatory sentences, including life imprisonment without possibility of parole for certain drug offenses.

The Penal Code, when enacted in 1931, similarly provided a maximum penalty of ten years for an assault of a female with intent to commit the crime of rape. 1948 CL 750.85. That provision was repealed when the criminal sexual conduct provisions were added by 1974 PA 266.

[8] Sentences of thirty to sixty years and forty to eighty years have been imposed by some judges under the authority of the "any term of years" language. Such sentences are, in effect, life sentences without possibility of parole under this Court's decisions.

"with intent to commit the crime of murder"[9] or "with intent to rob and steal" by a person armed with a dangerous weapon,[10] or for an assault ("forcibly seiz[ing] or confin[ing]") with intent to cause the victim "to be secretly confined or imprisoned."

The maximum sentence that could be imposed for an assault with "intent to do great bodily harm, less than the crime of murder"[11] is ten years, for an assault with force and violence, and with intent to rob and steal (unarmed)[12] it is fifteen years, and for an assault with "intent to commit criminal sexual conduct involving sexual penetration"[13] it is ten years.

In light of the legislative judgment that a sentence for life or any term of years should be imposed where the assault involved an intent to commit murder or armed robbery, and that the maximum sentence for an assault with intent to do great bodily harm less than murder or with intent to commit unarmed robbery or with intent to commit rape should be a maximum of ten or fifteen years, I doubt that the Legislature intended that a person be subject to conviction of the capital offense of kidnapping, subjecting the offender to a life sentence or a box score sentence,[14] where the assault—"forcibly seiz[ing] or confin[ing]"—was committed only with the intent to "secretly confine" and without intent to cause physical harm or hold the victim for ransom or to facilitate the commission of another felony.

---

[9] MCL 750.83; MSA 28.278.

[10] MCL 750.89; MSA 28.284.

[11] MCL 750.84; MSA 28.279.

[12] MCL 750.88; MSA 28.283.

[13] MCL 750.520g(1); MSA 28.788(7)(1).

[14] In effect, a life sentence without possibility of parole under this Court's decisions.

III

The majority holds that a rational trier of fact could have found that Jaffray in fact secretly confined Bruce Williams because:

1) From the time Jaffray initially bound Williams on the living room floor to the time that Curtis Kennedy learned that Williams was being held in the house and heard Williams' screams, nobody outside the house knew of Williams' confinement.

2) After Jaffray learned that Williams' screams may have been audible outside the house, he moved Williams to the basement, "clearly an area of greater isolation."

3) After moving Williams to the basement, Jaffray was part of a concerted effort to "maintain the secrecy of Williams' location." [*Ante,* pp 310-311.]

Taking the last factor first, an accused could not be convicted of secret confinement kidnapping however strong his desire to secretly confine the victim if the confinement was not in fact secret. Jaffray's participation in a concerted effort to maintain the secrecy of Williams' confinement is not pertinent to a determination whether Williams was *in fact* secretly confined. Indeed, the majority notes that a specific intent to confine is not an element of secret confinement kidnapping.[15]

Nor did Jaffray commit secret confinement kidnapping by carrying Williams to the basement. By the time Williams was carried to the basement, he had already communicated his plight to the outside world—and thereby foiled his captors' efforts to keep his confinement secret—by screaming

---

[15] *Ante,* p 298.

through the window of the upstairs bedroom where he was being held.[16]

The majority implies, however, that Jaffray's carrying Williams to the basement is relevant to whether Jaffray secretly confined Williams because transporting Williams to the basement reestablished the secrecy of Williams' confinement.

The majority stresses that, while the outside world may have known of Williams' confinement and of his need for help, nobody outside the house knew that Williams was being held in the basement, and his confinement there was thus secret.

Curtis Kennedy and his mother were aware that Williams was being held captive in the house and were aware that Williams needed help. While it is true that neither Kennedy nor his mother knew exactly where in the house Williams was being held, they had enough information—as a result of Williams' earlier communication of his plight—to summon help for Williams, and the officers who responded to their call *went into the basement*[17] and would probably have been able to rescue Williams from the basement if he had not been killed before their arrival.

Jaffray's movement of Williams to the basement did not reestablish the secrecy of his confinement. It did not disable Kennedy and his mother from sending assistance to Williams. The veil of secrecy that was broken by Williams' screams from the bedroom was not "temporarily" but, rather, "permanently" shattered by those screams. The loca-

---

[16] The majority concedes that the veil of secrecy was "temporarily fractured" when Curtis Kennedy heard Williams' screams. *Ante,* p 310. See part V(A).

[17] Officer Richard Hudson testified that when he and his partner David Mitchell first visited the Normandin home, he searched for Williams in the basement, but did not find him at that time.

tion of Williams' confinement was not secret after he was moved to the basement.[18]

The majority emphasizes that a reasonable fact-finder could find that Jaffray committed secret confinement kidnapping because nobody in the outside world knew of Williams' confinement between the time that Williams was initially bound in the living room and the time that Curtis Kennedy learned of his condition.[19] I agree with the majority that the confinement during this indeterminate period was secret.

It is again noteworthy that Jaffray had no intent to harm Williams. He sought to assure that Williams did not run away before the dog was found.

## IV

I do not wish to be understood as suggesting that what occurred here should not be subject to more serious penalties than for an ordinary assault. Nor would I contend that this particular defendant is

---

[18] *State v Randall,* 137 Mont 534, 539; 353 P2d 1054 (1960), in which the Montana Supreme Court found secret confinement on the following facts:

> Cozzens [a prison guard] was seized by defendant and his associates, all of whom were armed with knives; that he was taken by a concealed route to an underground cell in another part of the prison from that where he was seized; that he and the other hostages were later moved from cell to cell and warned not to make their location known to persons outside the prison who desired to rescue them . . . .

In the instant case, unlike in *Randall,* individuals who wanted to rescue the victim knew with a high degree of specificity where the victim was being held captive. In *Randall,* the authorities apparently had to stage an armed assault on the prison and search through the entire prison in order to locate the victims. In this case, though, the information supplied by Williams' screams were sufficient to bring help to the exact location where he was being held captive: the basement. Again, had Williams been alive when the police arrived, the police almost surely would have found him tied to the pole in the middle of the basement.

[19] *Ante,* p 310.

guilty of nothing more than the common-law offense of false imprisonment.

The Model Penal Code establishes a carefully tiered offense and sentencing system to address the tendency of broadly worded kidnapping statutes to yield absurd results in many cases of relatively minor confinements.[20]

---

[20] The Model Penal Code provides:

212.1 Kidnapping

A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business, or a substantial distance from the vicinity where he is found, or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following purposes:

(a) to hold for ransom or reward, or as a shield or hostage; or

(b) to facilitate commission of any felony or flight thereafter; or

(c) to inflict bodily injury on or to terrorize the victim or another; or

(d) to interfere with the performance of any governmental or political function.

Kidnapping is a felony of the first degree unless the actor voluntarily releases the victim alive and in a safe place prior to trial, in which case it is a felony of the second degree. A removal or confinement is unlawful within the meaning of this Section if it is accomplished by force, threat or deception, or, in the case of a person who is under the age of 14 or incompetent, if it is accomplished without the consent of a parent, guardian or other person responsible for general supervision of his welfare.

\* \* \*

212.2 Felonious Restraint

A person commits a felony of the third degree if he knowingly:

(a) restrains another unlawfully in circumstances exposing him to risk of serious bodily injury; or

(b) holds another in a condition of involuntary servitude.

\* \* \*

212.3 False Imprisonment

A person commits a misdemeanor if he knowingly restrains another unlawfully so as to interfere substantially with his liberty.

\* \* \*

212.4 Interference with Custody

(1) Custody of Children. A person commits an offense if he

knowingly or recklessly takes or entices any child under the age of 18 from the custody of its parent, guardian or other lawful custodian, when he has no privilege to do so. It is an affirmative defense that:

(a) the actor believed that his action was necessary to preserve the child from danger to its welfare; or

(b) the child, being at the time not less than 14 years old, was taken away at its own instigation without enticement and without purpose to commit a criminal offense with or against the child.

Proof that the child was below the critical age gives rise to a presumption that the actor knew the child's age or acted in reckless disregard thereof. The offense is a misdemeanor unless the actor, not being a parent or person in equivalent relation to the child, acted with knowledge that his conduct would cause serious alarm for the child's safety, or in reckless disregard of a likelihood of causing such alarm, in which case the offense is a felony of the third degree.

(2) Custody of Committed Persons. A person is guilty of a misdemeanor if he knowingly or recklessly takes or entices any committed person away from lawful custody when he is not privileged to do so. "Committed person" means, in addition to anyone committed under judicial warrant, any orphan, neglected or delinquent child, mentally defective or insane person, or other dependent or incompetent person entrusted to another's custody by or through a recognized social agency or otherwise by authority of law.

\* \* \*

212.5 Criminal Coercion

(1) Offense Defined. A person is guilty of criminal coercion if, with purpose unlawfully to restrict another's freedom of action to his detriment, he threatens to:

(a) commit any criminal offense; or

(b) accuse anyone of a criminal offense; or

(c) expose any secret tending to subject any person to hatred, contempt or ridicule, or to impair his credit or business repute; or

(d) take or withhold action as an official, or cause an official to take or withhold action.

It is an affirmative defense to prosecution based on paragraphs (b), (c) or (d) that the actor believed the accusation or secret to be true or the proposed official action justified and that his purpose was limited to compelling the other to behave in a way reasonably related to the circumstances which were the subject of the accusation, exposure or proposed official action, as by desisting from further misbehavior, making good a wrong done, refraining from taking any action or responsibility for which the actor believes the other disqualified.

(2) Grading. Criminal coercion is a misdemeanor unless the threat is to commit a felony or the actor's purpose is felonious,

In a recent case, one of the justices called upon the Legislature to address the problem of sentencing youthful offenders for capital offenses. In the same spirit, I call upon the Legislature to address the many problems created by our kidnapping statute. I respectfully suggest that the Legislature study the Model Penal Code provisions for kidnapping and the accompanying commentaries[21] with a

_____

in which cases the offense is a felony of the third degree. [ALI, Model Penal Code and Commentaries, part II, §§ 212.1 to 212.5, pp 209-210, 237, 244, 248, 262-263.]

[21] The commentary to § 212.1 of the Model Penal Code states, in part:

2. *Rationale.* The central problem in the law of kidnapping is to restrict the drastic sanctions authorized for this offense to instances of misbehavior warranting such punishment. The challenge, in other words, is to define the crime in terms that identify a distinct kind of wrongful act. This goal requires avoidance of two related dangers.

First, the entire range of misconduct based on unlawful confinement of another must not be lumped together in one undifferentiated offense for purposes of grading. The person who physically restrains another on a public street in order to drive a point home is guilty of wrongful interference with the other's personal liberty, but a rational penal code must distinguish such conduct from prolonged confinement and isolation from the protection of the law. Even instances of more serious misbehavior, such as locking another in a closet for several hours, should be treated differently from abduction for ransom. Finally, the extreme gravity of sanctions authorized under existing law is related to the prospect that the victim will not emerge alive. This danger is precluded if the kidnapper voluntarily releases his captive, and the law should take some account of such action.

The Model Code addresses these concerns by defining three progressively less serious offenses and distributing them across a wide range of felony and misdemeanor sanctions. The reasoning behind the definition of the lesser crimes of felonious restraint and false imprisonment is explained in the commentary to Sections 212.2 and 212.3, respectively. Grading within the kidnapping offense is discussed in Comments 4 and 5 below.

The other potential danger which a rational penal code must avoid is that the definition of kidnapping will sweep within its scope conduct that is decidedly wrongful but that should be punished as some other crime. Thus, for example, the robber who forces his victim to move from one room to another in

view to reconstructing the kidnapping statute.

## V

The concurring opinion makes a number of points to which I now respond.

### A

The concurring opinion states "Specifically, I do not agree that the majority 'concedes' that the veil of secrecy was fractured."[22]

The referenced sentence in the majority opinion reads as follows: "When Ronald Normandin disclosed to Curtis Kennedy that Williams was 'dog tied' upstairs, and Kennedy allegedly heard Williams upstairs screaming for help, the veil of secrecy was temporarily fractured, but it was not completely destroyed."[23] Thus, the reference to the majority opinion is accurate.

### B

The concurring opinion states:

> The prosecutor has not "conceded" that the

order to find a cashbox or open a safe technically may commit kidnapping as well as robbery. This reasoning raises the possibility of cumulative penalties or of higher sanctions for kidnapping, even though the "removal" of the victim to another place was part and parcel of the robbery and not an independent wrong. Similarly, many instances of forcible rape involve some coerced movement of the victim or unlawful restraint for enough time to complete the sex act. Again, the actor may be liable for both kidnapping and rape, even though such asportation or detention of the victim is a criminologically insignificant circumstance in a course of conduct constituting rape. Definition of kidnapping to exclude such cases is a task of special subtlety for, unless particular care is taken, trivial aspects of robbery, rape, or some other crime will end up classified as the most serious version of kidnapping.

[22] *Ante,* p 314.
[23] *Ante,* p 310.

defendant did not intend to cause physical harm to the victim.[24]

The following is an excerpt from the prosecutor's brief:

> What is truly remarkable about this case is that two "technically" separate offenses were committed by different defendants during the same criminal episode. The evidence adduced at the trial of Jaffray and the Normandin brothers showed that their only intent was to commit secret confinement kidnapping. They only intended to confine Bruce Williams in order to force him to reveal the location where he sold Ronald Normandin's dog for crack cocaine. Jaffray's written statement shows that they intended to release him after the dog was retrieved. Due both to a pre-existing grudge and to the fact that Williams had stolen his friend's dog, Francis Hamilton apparently took it upon himself to beat Williams to death with a baseball bat.[25]

While there is evidence that Jaffray bound and gagged Williams, there is no evidence that he beat Williams or encouraged others to do so. Nor would "common sense suggest" that, from the beginning, this incident "was likely to end, as it did, in someone's death."[26] When Jaffray and the Normandins initially bound Williams, they had no intention of harming him, and they had no reason to believe that Hamilton would, in the prosecutor's words, take "it upon himself" to kill Williams. When the incident began, there was no indication that Hamilton might become involved in the situation, much less kill Williams.

Because Jaffray did not intend to harm or terrorize Williams, it does not appear that the Model

[24] *Ante,* p 315, n 2.

[25] Prosecutor's brief, p 15.

[26] *Ante,* p 315.

Penal Code would permit a conviction of the most serious grade of kidnapping as the concurring opinion suggests.[27] Rather, under the Model Penal Code, the crime of false imprisonment appears to most appropriately apply to Jaffray's conduct, although Jaffray might also have committed felonious restraint.[28]

C

The concurring opinion asserts that in none of

[27] *Ante,* p 315.
The concurring opinion suggests that Jaffray could be guilty of kidnapping under § 212.1(c) of the Model Penal Code, which provides:

> 212.1 Kidnapping
> A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business, or a substantial distance from the vicinity where he is found, or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following *purposes:*
>                    *   *   *
> (c) *to inflict bodily injury on or to terrorize the victim or another* . . . . [Emphasis added.]

Jaffray intended only to confine Williams until he and the Normandins could retrieve the dog. He did not intend to harm or terrorize Williams (see text accompanying n 25), and therefore would not be guilty of kidnapping under § 212.1(c) of the Model Penal Code.
[28] Section 212.3 of the Model Penal Code provides:

> False Imprisonment
> A person commits a misdemeanor if he knowingly restrains another unlawfully so as to interfere substantially with his liberty.

This provision appears to apply to Jaffray who intended to restrain Williams so as to interfere substantially with his liberty.
Section 212.2 of the Model Penal Code provides:

> Felonious Restraint
> A person commits a felony of the third degree if he knowingly:
> (a) restrains another unlawfully in circumstances exposing him to risk of serious bodily injury . . . .

the "thousands of cases this Court has reviewed in the decade since the decision in *People v Wesley,* 421 Mich 375; 365 NW2d 692 (1984),"[29] has this Court been presented with a situation in which a defendant was convicted of kidnapping on the basis of a relatively minor confinement.

While this Court has reviewed thousands of cases, indeed even thousands of criminal cases, in the decade since *Wesley* was decided, it most assuredly has not reviewed thousands, or even hundreds, of kidnapping cases. It has reviewed even fewer secret confinement kidnapping cases.

This Court generally sees an application for leave to appeal only in a case in which a lengthy term of imprisonment has been imposed. Thus, we do not know to what extent charges of secret confinement kidnapping are washed out in plea bargaining in exchange for charge or sentencing concessions. Because an accused charged with a capital offense carrying a potential life sentence might be constrained to plead guilty to a lesser offense or to agree to the imposition of a particular sentence, it is especially important that the substantive law of kidnapping recognize the risk and potential for overcharging.

[29] *Ante,* p 316.