PEOPLE v WARREN

Docket No. 111745. Argued December 7, 1999 (Calendar No. 2). Decided
    July 11, 2000.

Brian A. Warren was convicted by a jury in the Calhoun Circuit Court,
    Stephen B. Miller, J., of first-degree felony murder, first-degree
    criminal sexual conduct, assault and battery, kidnapping, and
    unlawfully driving away an automobile. A pretrial motion by the
    defendant claiming the spousal privilege was denied by the trial
    court because his wife had a cause of action under the wrongful
    death statute and it followed that she could testify pursuant to the
    personal-wrong exception to the spousal privilege. The Court of
    Appeals, MARKEY, P.J., and MICHAEL J. KELLY and WHITBECK, JJ.,
    affirmed. 228 Mich App 336 (1998) (Docket No. 190133). The
    defendant appeals.

In an opinion by Justice KELLY, joined by Chief Justice WEAVER,
    and Justices TAYLOR, CORRIGAN, YOUNG, and MARKMAN, the Supreme
    Court held:

The defendant's spouse may testify about all the crimes of which
    the defendant was convicted. The defendant's purpose in embark-
    ing on his crime spree was to commit a personal wrong against or
    injury to his wife. He achieved this objective, and all the crimes he
    perpetrated grew out of it.

1. The spousal privilege of MCL 600.2162; MSA 27A.2162 at the
    time of the events in this case was vested in the nonwitness
    spouse. The privilege could be asserted only while the spouses
    were legally married, and precluded all testimony regardless of
    whether the events occurred before or during the marriage, unless
    one of several exceptions were applicable. Under the personal
    wrong exception, one spouse could testify against the other if the
    cause of action grew out of a personal wrong or injury done by one
    spouse to the other. The "grows out of" wording requires a connec-
    tion between the cause of action and the harm or injury committed
    against the spouse. The other crimes must have as their seed the
    personal wrong or injury committed against the spouse. However,
    the phrase does not limit spousal testimony to those crimes of
    which the spouse was the direct victim. The exception allows a vic-
    tim-spouse to testify about a persecuting spouse's precedent crimi-

nal acts where the underlying goal or purpose of the persecuting spouse is to cause the victim-spouse to suffer personal wrong or injury, the earlier criminal acts are committed in furtherance of that goal, and the personal wrong or injury against the spouse is ultimately completed or done. Thus, where a persecuting spouse's criminal activities have roots in acts ultimately committed against the victim-spouse, those preparatory crimes constitute causes of action that grow out of a personal wrong or injury done by one to the other. The underlying intent, the "seed" from which the other criminal acts grew, was the personal wrong or injury done to the spouse.

2. In this case, the Court of Appeals justification for permitting the defendant's spouse to testify against him concerning the crimes against her mother, i.e., that the wife's testimony about the crimes was admissible as evidence of other bad acts, was error. There is no authority for employing this unrelated rule of evidence to broaden the exception to the spousal privilege. The other bad acts were charged crimes that, but for the spousal privilege statute, the wife would have been permitted to testify about regardless of MRE 404(b)(1).

Justice CAVANAGH, concurring, stated that the exception for spousal testimony does not apply to allow the witness-spouse to testify against the defendant regarding the felony murder or UDAA. These crimes did not grow out of a personal wrong or injury done by the defendant to Ms. Warren. However, because there was extensive evidence against the defendant relating to the crimes of felony murder and UDAA, including the defendant's detailed confession, the error was harmless under *People v Lukity*, 460 Mich 484 (1999).

Affirmed in part and reversed in part.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *Susan K. Mladenoff*, Prosecuting Attorney, and *Jennifer Kay Clark*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Lyle N. Marshall*) for the defendant-appellant.

Amicus Curiae:

*Elwood Brown*, President, *John D. O'Hair*, Prosecuting Attorney, and *Timothy A. Baughman*, Chief,

Research, Training and Appeals, for Prosecuting Attorneys Association of Michigan.

KELLY, J. The Court of Appeals affirmed defendant's convictions for first-degree felony murder,[1] two counts of first-degree criminal sexual conduct (CSC I),[2] assault and battery,[3] kidnapping,[4] and unlawfully driving away an automobile (UDAA).[5] We affirm the defendant's convictions, at the same time finding that the Court of Appeals rationale for its affirmance was in error.

## I. FACTS

This factual summary was established at trial through the voluntary testimony of defendant's wife, Regina Warren, except where otherwise indicated.

On January 18, 1995, defendant prepared a candlelight dinner for Ms. Warren. She discovered that he had been drinking. Defendant's alcohol consumption had been a cause of continuing confrontation in their marriage. This occasion was no exception, and Ms. Warren returned upstairs without eating the dinner.

Defendant became angry at her behavior and reacted by threatening to tie her up and throw her in the basement. He found a plastic clothes line and set about binding her with it, telling her to stand up or something would happen to her. As she stood up, he

---

[1] MCL 750.316; MSA 28.548.

[2] MCL 750.520b(1)(c); MSA 28.788(2)(1)(c).

[3] MCL 750.81; MSA 28.276.

[4] MCL 750.349; MSA 28.581.

[5] MCL 750.413; MSA 28.645.

held her hands behind her back. At that moment, the
doorbell rang.

Ms. Warren pounded on the window to alert the
person at the door to her plight. It was Ms. Warren's
sister, who, when told of the situation, left the house,
taking Ms. Warren and her children to her own house.
From there, Ms. Warren and the children went with
Ms. Warren's mother, Ms. Powell, to the latter's house.

Later in a bedroom at her mother's, Ms. Warren
noticed that a window had been broken in an exterior
door. Ms. Powell concluded that defendant had forced
his way into the house. She had seen him walking
outside earlier. They called the police. An officer
arrived and checked the house for intruders. He did
not discover defendant in the basement.

Later, Ms. Warren was awakened by her mother
screaming from the basement for her to call the
police. Ms. Warren rushed to the basement stairwell
where she encountered her husband running up the
stairs with a knife in his hand. She seized a mop and
struck him with it.

Defendant told Ms. Warren that he loved her and
would never hurt her. He wiped the knife with some
material and put it down near the sink. Ms. Warren
tried to determine if her mother had been injured, but
defendant prevented it. He said he wanted her to feel
what it is like to be beaten, and he punched her in the
face.

He took her to a bedroom and continued to beat
her on her face and body. He then forced her to per-
form fellatio on him and raped her vaginally.

The children awakened, and Ms. Warren asked to
see them. Defendant agreed and went back to the
basement for about five minutes. She repeated her
request to see her mother. Defendant replied that, if

she went downstairs, she would not return. He said her mother had stumbled over a basket and hit her head on the floor.

After sunrise, Ms. Warren asked defendant to leave the house to get some personal items for her and he agreed. Before leaving, he bound her, put a sock in her mouth and secured the sock by tying a cloth around her head.

Ms. Warren heard her mother's car start and depart. She freed her feet and ran to the basement. Turning on the light, she saw a large pool of blood. She screamed for her mother through the gag, but heard no response. She then ran out the front door with her hands and mouth still tied. A neighbor let her in and allowed her to call the police.

The neighbor described her as disheveled, shaky, and emotional. Ms. Warren said she had been raped, believed her mother had been killed in the basement of her house, and expressed concern for her children.

When the police arrived, they found Ms. Powell dead, lying in a large pool of blood in her basement. An autopsy revealed that she had been stabbed eight times.

A police detective, gathering evidence at the scene, collected a beer can with defendant's fingerprints on it and a large butcher knife. He found fabric that appeared to be discolored by blood, as though an object had been wiped on it. He also collected glass from a broken window.

Defendant was driving Ms. Powell's car on a highway out of town when the police arrested him. He had cuts and scrapes on his hands. Stains appearing to be blood were on his pants. After waiving his

*Miranda*[6] rights, he gave a self-incriminating statement that the police videotaped. He stated that, upon returning with supplies, he observed a fire truck in front of Ms. Powell's house. He turned around, stopped briefly at his house and took a back road out of town.

Defendant filed a pretrial motion claiming that the spousal privilege statute[7] prevented his wife from testifying about the facts supporting felony-murder, first-degree home invasion[8] and UDAA. The trial judge denied the motion by written opinion, finding that Ms. Warren could testify about defendant's crimes against her mother. She had a cause of action under the wrongful death statute.[9] It followed that a personal wrong had been done to Ms. Warren by her husband, and she could testify pursuant to the "personal wrong" exception to the spousal privilege.[10] During trial, the defense renewed its objection, in order to preserve it in the record.

A jury convicted defendant on all charged counts. The home invasion conviction was vacated at sentencing, because it was the felony underlying the felony-murder conviction.

The Court of Appeals affirmed. It agreed that defendant's spouse could testify against him, pursuant to the personal wrong exception. It held that she could testify about those crimes that were committed against her mother and her mother's property. It found that such evidence provided a relevant context for the remaining crimes that qualified as personal

---

[6] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[7] MCL 600.2162(1); MSA 27A.2162(1).

[8] MCL 750.110a(2); MSA 28.305(a)(2).

[9] MCL 600.2922; MSA 27A.2922.

[10] MCL 600.2162(1)(d); MSA 27A.2162(1)(d).

wrongs. 228 Mich App 336, 342-343; 578 NW2d 692 (1998).

It noted that Ms. Warren's testimony about seeing defendant run up the basement stairs with a knife after her mother screamed implicated defendant in the home invasion and murder charges. However, it found this testimony admissible, as it also explained why Ms. Warren did not resist his later acts of assault, rape, and confinement. Ms. Warren's testimony that she heard defendant drive away in her mother's automobile implicated defendant in the UDAA charge. However, the Court of Appeals found that the testimony was admissible as pertinent to the kidnapping charge, because it explained why defendant bound and gagged Ms. Warren.

The Court of Appeals concluded that all Ms. Warren's testimony was properly admitted because "[a] party should 'be able to give the jury an intelligible presentation of the full context in which disputed events took place.' *People v Sholl*, 453 Mich 730, 741; 556 NW2d 851 (1996)." 228 Mich App 342. The crimes that did not fit within the exception were blended with and explained the circumstances of those crimes that did qualify. *Id.* at 742.

We granted defendant's application for leave to appeal. 460 Mich 851 (1999).

## II. MICHIGAN'S SPOUSAL PRIVILEGE STATUTE

At the time of the events in this case, Michigan's spousal privilege statute provided in relevant part:[11]

---

[11] On June 20, 2000, the Legislature amended the spousal privilege statute. 2000 PA 182. The amendments do not eliminate the "personal wrong" exception.

(1) A husband shall not be examined as a witness for or against his wife without her consent or a wife for or against her husband without his consent, except as follows:

\*     \*     \*

(d) In a cause of action that *grows out of* a personal wrong or injury done by one to the other . . . . [MCL 600.2162; MSA 27A.2162 (emphasis added).]

The statute vested the privilege in the nonwitness spouse. The privilege could be asserted only while the spouses were legally married, and it precluded all testimony regardless of whether the events occurred before or during the marriage. *People v Hamacher*, 432 Mich 157, 161; 438 NW2d 543 (1989); *People v Wadkins*, 101 Mich App 272, 282; 300 NW2d 542 (1980).[12]

### A. *PEOPLE v QUANSTROM* [13]

Over one hundred years ago, in *People v Quanstrom*, this Court rendered a narrow interpretation of the personal injury exception to the spousal privilege. It found that a wife could not testify in her husband's prosecution for bigamy. The Court read "personal [wrong or] injury" to mean "violence, either actual or constructive, to the person." *Id.* at 256. "If not a crime against her, it certainly is not a wrong which is personal to her." *Id.* at 260.

The Michigan Legislature later amended the spousal privilege statute specifically to include a bigamy exception.[14] More recently, in *People v Butler*,[15]

---

[12] Unless modified by statute or court rule, privileges are governed by common law. MRE 501.

[13] 93 Mich 254; 53 NW 165 (1892).

[14] 1897 PA 212, § 1.

[15] 430 Mich 434; 424 NW2d 264 (1988).

this Court effectively limited *Quanstrom*'s narrow reading of the exception to cases of bigamy. *Id.* at 439. In that case, the defendant was charged with arson of a dwelling house[16] after setting his wife's apartment afire. She was allowed to testify against him under the personal wrong exception, even though she had not been physically injured. The Court concluded:

> We see no reason . . . to interpret the "personal wrong or injury" exception in the narrow fashion stated by *Quanstrom*. [*Id.* at 439.]

As the bigamy exception had been added to the spousal privilege statute when *Butler* was issued, *Butler* left *Quanstrom* with no precedential value, the holding having no application.[17]

### B. *PEOPLE v LOVE*[18]

A 1986 decision of this Court regarding the personal wrong exception to the spousal privilege statute, *People v Love*, addressed facts very similar to those in the present case.

In *Love*, the defendant's wife was the prosecution's main witness, establishing the bulk of its case. *Id.* at

---

[16] MCL 750.72; MSA 28.267.

[17] Other cases reaffirm *Butler*'s abandonment of *Quanstrom*'s narrow reading of the personal wrong exception. In *People v Eberhardt*, 205 Mich App 587; 518 NW2d 511 (1994), the defendant's wife was allowed to testify that he took her Aid for Dependent Children check, forged her signature and cashed it. Also, *People v Pohl*, 202 Mich App 203; 507 NW2d 819 (1993), remanded on other grounds 445 Mich 918 (1994), found one spouse's destruction of the other's personal property qualified as a personal wrong or injury under the exception.

[18] 425 Mich 691; 391 NW2d 738 (1986).

694. The defendant was separated from his wife, and
she had instituted divorce proceedings. He believed
she was sexually intimate with Johnny McQueen, one
of her co-workers. The defendant contacted McQueen
and asked him to come to his wife's house to discuss
his relationship with her. *Id.* at 694-695.

When McQueen arrived, the defendant and his wife
got into McQueen's car, the wife in the passenger seat
and the defendant in the back behind McQueen. After
some discussion, the defendant suddenly shot
McQueen in the head, killing him. He then kidnapped
his wife, turning the gun on her and driving off aim-
lessly. *Id.* at 695.

Ms. Love indicated at trial that she did not wish to
testify. The court compelled her testimony concerning
the charges of kidnapping, second-degree murder[19]
and possession of a firearm during the commission of
a felony.[20] *Id.* at 708. The court denied a defense
motion to preclude Ms. Love's testimony regarding
the latter two charges under the spousal privilege
statute. Defendant was convicted of all three charges,
and the Court of Appeals affirmed the convictions. *Id.*
at 694-695.

In a plurality opinion, this Court found that a wit-
ness-spouse could not be compelled to testify under
the personal wrong exception, and that the exception
was inapplicable on these facts. In the lead opinion,
with Justice LEVIN concurring, Justice CAVANAGH
wrote:

> The phrase "grows out of" indicates that the particular
> cause of action must be for the personal injury inflicted

---

[19] MCL 750.317; MSA 28.549.

[20] MCL 750.227b; MSA 28.424(2).

upon one spouse by the other. The prosecution's cause of action for kidnapping grew out of the personal wrong inflicted upon Mrs. Love. The cause of action for murder and felony-firearm grew out of the personal injury inflicted upon Mr. McQueen. The fact that the three offenses occurred during the same criminal transaction is irrelevant to the determination of which cause of action grew out of which personal wrong or injury. [*Id.* at 702-703.]

Supplying the deciding votes, Chief Justice WILLIAMS in a concurring opinion, joined by Justice BRICKLEY, found the personal wrong exception inapplicable, using a different rationale:

[A] cause of action cannot "grow[] out of a personal wrong or injury done by one to the other" that did not occur at the time of the "cause of action" .... [*Id.* at 709.]

They focused on the temporal sequence of the offenses, and decided that only if the spouse was wronged first could subsequent criminal acts be found to "grow[] out of" that personal wrong or injury.

Thus, Ms. Love was not permitted to testify concerning the charges of murder and felony-firearm. The admission of this testimony was not harmless error, because his wife was the only witness who testified about the commission of these crimes. *Id.* at 706. The Court reversed the defendant's convictions on the two charges. *Id.* at 709.

Justice BOYLE, joined by Justice RILEY, entered a dissenting opinion. She rendered yet a third interpretation of the language of the spousal privilege statute, agreeing with the holding of the Court of Appeals in its decision:

"[A] crime committed against a third person as part of the
same criminal transaction as a crime committed against a
spouse 'grows out of a personal wrong or injury' done to
the spouse and is therefore within the exception." [*Id.* at
713, quoting *People v Love*, 127 Mich App 596, 602; 339
NW2d 493 (1983).]

She further concluded that a spouse may be com-
pelled to testify under the statute. *Id.* at 716. Thus,
Justice BOYLE concluded that the spouse's testimony
was properly admitted under the exception and that
defendant's convictions should be affirmed. *Id.* at 717.

### C. *PEOPLE v VANN* [21]

Nine years later, in *People v Vann*, this Court stated
that "[a] majority of justices agreed that the wife in
*Love* could not testify in the murder prosecution
because the offense against the third-party decedent
occurred before the offense against the wife . . . ."
*Id.* at 51. This statement does not accurately reflect
the holding in Justice CAVANAGH's lead opinion. It
stated that the "crime charged must have been com-
mitted against the witness-spouse to come within the
'personal wrong or injury' exception." *Love, supra* at
703. The lead opinion never acknowledged the tempo-
ral sequence test advocated by Chief Justice WILLIAMS
and Justice BRICKLEY.

In *Vann*, the husband attacked both his wife and
the third party, simultaneously committing a single
criminal act against two victims. *Vann, supra* at 52.
There was no temporal sequence to the conduct.
Therefore, because the Court did not employ the tem-

---

[21] 448 Mich 47; 528 NW2d 693 (1995).

poral-sequence test in reaching its conclusion, its comments with respect to this test were dicta. *People v Case*, 220 Mich 379, 382-383; 190 NW 289 (1922).

Contrary to the statement of this Court in *Vann*, *Love* lacks a majority holding. It does not serve as binding precedent.[22] The lead opinion drafted by Justice CAVANAGH and the concurring opinion drafted by Chief Justice WILLIAMS cannot be reconciled; they have no common denominator except in result.

### III. STATUTORY INTERPRETATION

The Court's varied readings of the personal wrong exception to the spousal privilege in the opinions discussed here bear witness to the ambiguous language of the exception. "If reasonable minds can differ concerning the meaning of a statute . . . judicial construction is appropriate." *Heinz v Chicago Rd Investment Co*, 216 Mich App 289, 295; 549 NW2d 47 (1996). As *Quanstrom*'s narrow reading of the exception retains no precedential force and the plurality opinion in *Love* lacks a majority holding, the bounds of the exception are not clearly delineated.

Privileges are narrowly defined and their exceptions broadly construed. *Univ of Pennsylvania v EEOC*, 493 US 182; 110 S Ct 577; 107 L Ed 2d 571 (1990). Professor McCormick aptly explains why privileges are not generally endorsed or broadly construed:

---

[22] Decisions without a clear majority holding do not constitute binding authority under the doctrine of stare decisis. *Negri v Slotkin*, 397 Mich 105, 109; 244 NW2d 98 (1976).

> The overwhelming majority of all rules of evidence have as their ultimate justification some tendency to promote the objectives set forward by the conventional witness' oath, the presentation of "the truth, the whole truth, and nothing but the truth." . . . By contrast the rules of privilege . . . are not designed or intended to facilitate the fact-finding process or to safeguard its integrity. Their effect instead is clearly inhibitive; rather than facilitating the illumination of truth, they shut out the light. [1 McCormick, Evidence (5th ed), § 72, pp 298-299.]

We decline to follow the reading of the personal wrong exception set forth by Justice CAVANAGH's lead opinion in *Love*. It follows the view delineated by *Quanstrom*, which, as we have noted, retains no precedential value and has been abandoned by later decisions. The "grows out of" wording requires a connection between the cause of action and the harm or injury committed against the spouse. However, the phrase does not limit spousal testimony to those crimes of which the spouse was the direct victim.

On the other hand, we reject the "same transaction" test advanced by Justice BOYLE in her dissent in *Love*. To find that *any* additional crime done by a defendant when he commits a crime against his spouse "grows out of a personal wrong or injury done" to the spouse stretches the exception beyond its plain language. The "broad, comprehensive and general meaning" that has been ascribed to the phrase still requires that the other crimes have as their seed the personal wrong or injury committed against the spouse.[23]

---

[23] Several courts, in interpreting the phrase "arising out of" in insurance contracts, have found the phrase to have a broad, comprehensive, and general meaning synonymous with the phrase "grows out of," as well as the phrases "originating from," "having its origin in," or "flowing from." *League of Minnesota Cities Ins Trust v Coon Rapids*, 446 NW2d 419, 422

We find Justice BOYLE's and Justice CAVANAGH's interpretations of "grows out of" in *Love* to be too broad and too narrow, respectively. However, we agree that the temporal sequence test set out in Chief Justice WILLIAMS' *Love* concurrence has support in the language of the statute.

Additionally, we read the exception to allow a victim-spouse to testify about a persecuting spouse's precedent criminal acts where (1) the underlying goal or purpose of the persecuting spouse is to cause the victim-spouse to suffer personal wrong or injury, (2) the earlier criminal acts are committed in furtherance of that goal, and (3) the personal wrong or injury against the spouse is ultimately completed or "done."[24]

Thus, where a persecuting spouse's criminal activities have roots in acts ultimately committed against the victim-spouse, those preparatory crimes constitute "cause[s] of action that grow[] out of a personal wrong or injury done by one to the other . . . ." MCL 600.2162(1)(d); MSA 27A.2162(1)(d). This is because the underlying intent, the "seed" from which the other criminal acts grew, was the personal wrong or injury done to the spouse.

---

(Minn App, 1989); *Auto-Owners Ins Co v Transamerica Ins Co*, 357 NW2d 519 (SD, 1984); *Baca v New Mexico State Hwy Dep't*, 82 NM 689; 486 P2d 625 (1971); *Jamestown Mut Ins Co v General Accident, Fire & Life Assurance Corp*, 66 Misc 2d 952; 322 NYS2d 806 (NY Co Ct, 1971); *Ins Co of North America v Royal Indemnity Co*, 429 F2d 1014 (CA 6, 1970).

[24] "Every word of a statute should be given meaning and no word should be treated as surplusage or rendered nugatory . . . ." *Baker v General Motors Corp*, 409 Mich 639, 665; 297 NW2d 387 (1980).

### IV. ANALYSIS

In this case, we find the Court of Appeals justification for permitting the defendant's spouse to testify against him concerning the crimes against her mother to be in error.

The Court of Appeals held that the spouse's testimony about these crimes was admissible as evidence of other bad acts. 228 Mich App 342-343; MRE 404(b)(1); *Sholl, supra* at 742.[25] There is no authority for employing this unrelated rule of evidence to broaden the exception to the spousal privilege. The other bad acts here were charged crimes that, but for the spousal privilege statute, the spouse would have been permitted to testify about regardless of MRE 404(b)(1).[26]

We reject the Court of Appeals rationale. Brian Warren's underlying purpose throughout the entire criminal transaction was to commit a personal wrong

---

[25] In relevant part, MRE 404(b)(1) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

A litigant should "be able to give the jury an intelligible presentation of the full context in which disputed events took place." *Scholl, supra* at 741.

[26] "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of Michigan, these rules, or other rules adopted by the Supreme Court." MRE 402. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401.

against his wife or to injure her. Ms. Warren's testimony indicated that defendant initially assaulted and battered her at their house. He threatened to tie her up and throw her in the basement. He retrieved a plastic cord, ordered her to stand up and held her hands behind her back to make good on his threat. The arrival of Ms. Warren's sister interrupted the attack.

Not to be foiled, defendant broke into Ms. Powell's home and murdered Ms. Powell in order to have access to his wife. The defendant then assaulted, battered, raped, and kidnapped Ms. Warren. The crime of felony murder, based on the underlying felony of first-degree home invasion, grew out of these personal wrongs done to his wife.

Finally, defendant took Ms. Powell's car in order to obtain supplies for Ms. Warren, at her request. That he bound Ms. Warren before leaving indicates that his intention was to continue her secret confinement.[27] His motivation did not change to one of self-preservation until, returning from the errand, he saw a fire truck in front of Ms. Powell's house. Thus, the UDAA grew out of the kidnapping of Ms. Warren, bringing the UDAA within the personal wrong exception to the spousal privilege.

V. CONCLUSION

We affirm defendant's convictions. We find that defendant's spouse could testify about all the crimes of which defendant was convicted. Brian Warren's purpose in embarking on his crime spree was to com-

---

[27] Secret confinement is an element of one form of kidnapping under the statute. *People v Jaffray*, 445 Mich 287, 295; 519 NW2d 108 (1994).

mit a personal wrong against or injury to his wife. He achieved this objective, and all the crimes that he perpetrated grew out of it.

Affirmed in part and reversed in part.

WEAVER, C.J., and TAYLOR, CORRIGAN, YOUNG, and MARKMAN, JJ., concurred with KELLY, J.

CAVANAGH, J. (*concurring*). I disagree with the majority's interpretation of the spousal privilege exception found in MCL 600.2162; MSA 27A.2162. The majority's reading of the phrase "grows out of" rejects the statutory language and is little more than a restatement of the "same criminal transaction" test espoused by Justice BOYLE in her *People v Love* dissent.[1] However, because there was extensive evidence against defendant relating to the crimes of felony murder and UDAA, including defendant's detailed confession, I would hold the error harmless under *People v Lukity*, 460 Mich 484; 596 NW2d 607 (1999).

SPOUSAL PRIVILEGE

As I stated in my lead opinion in *Love*, the phrase "grows out of" indicates that a particular cause of action must be for the personal injury inflicted upon one spouse by the other. 425 Mich 702. In other words, the crime charged must have been committed against the witness-spouse to come within the exception. *Id.*

In this case, the prosecution's causes of action for first-degree criminal sexual conduct, assault and battery, and kidnapping grew out of the personal wrong

---

[1] 425 Mich 691, 713; 391 NW2d 738 (1986).

inflicted upon Ms. Warren by defendant. For these charges, the witness-spouse may testify under the statute. However, the causes of action for felony murder and UDAA grew out of the personal injuries inflicted upon Ms. Powell. The fact that there was a connection between the crimes against the two victims is not the determining factor in deciding which cause of action grew out of each personal wrong or injury. Moreover, the fact that the defendant subjectively related his crimes against third parties to wrongs against the witness-spouse has no relationship to the statutory language or intent of the Legislature.

The majority rejects my interpretation as following *People v Quanstrom*, 93 Mich 254; 53 NW 165 (1892). Instead, my interpretation follows, and is consistent with, the plain language of the statute. As I noted in *Love*, the Legislature responded to *Quanstrom* by amending the spousal privilege statute to except bigamy prosecutions. It did not amend the statutory language for suits " 'where the cause of action grows out of a personal wrong or injury done by one to the other' . . . ." 425 Mich 702. The majority provides that the amendment to include bigamy as an exception to the privilege indicates that the Legislature did not intend the narrow reading of the personal wrong exception rendered by the *Quanstrom* Court. *Ante* at 423. On the contrary, the addition of a specific exception for bigamy, while retaining the "narrow" remaining language, evidences the Legislature's agreement with a narrow rule. It did not amend the rule to include all precedential acts committed by a spouse when the underlying goal is to commit a wrong against the witness-spouse. *Ante* at 429. Since *Love*,

the statute was again amended, and the Legislature again retained the "grows out of" language.[2] Therefore, there is no reason to create yet another interpretation of the same statutory language.

I would hold that the exception for spousal testimony does not apply to allow the witness-spouse to testify against defendant regarding the felony murder or UDAA. These crimes did not grow out of a personal wrong or injury done by defendant to Ms. Warren.

HARMLESS ERROR

*Lukity* provides that the preserved errors are grounds for reversal if " 'after an examination of the entire cause, it shall affirmatively appear' that it is more probable than not that the error was outcome determinative." *Id.* at 495-496.

In this case, the prosecution provided twenty-six witnesses. Several police officers testified about finding the deceased Ms. Powell at the crime scene.

Thomas Ican, a neighbor testified that Ms. Warren knocked on his door, while still partially bound, and told him her mother may have been killed.

William Toskey testified that he took the 911 call that was then played to the jury.

Theresa Harris, defendant's sister-in-law, testified that defendant threatened her sister. In response, she took her sister to their mother's home. She identified the knife used in the stabbing as belonging to her mother.

---

[2] 1994 PA 67, § 2162(1).

Laurence Simson, a forensic pathologist, testified that Ms. Powell's death was caused by eight stab wounds.

Deputy Sheriff Todd Miller testified that he received a radio bulletin for a Buick Century about 11:50 A.M. on January 19, 1995. He saw what turned out to be defendant driving eastbound. He pursued defendant in a high speed chase that ended on a remote road. He testified that he hand cuffed defendant and transported him back to Battle Creek. Miller testified that, while in the car, defendant stated that "when I left that fucking place, they were all still alive." The deputy stated that defendant did not seem intoxicated.

Michael Van Stratton, supervisor of the Battle Creek crime laboratory, provided testimony as an expert in fingerprint evidence. He testified that he discovered a window that had been removed from the house, and a broken window from a door. He also seized a pair of boots and a beer can with defendant's fingerprints on it. He also testified that he seized a pair of what appeared to be blood-stained pants worn by defendant. He confirmed that no fingerprints were found on the knife or mop.

These witnesses support much of the most damaging evidence—that of defendant's videotaped confession. Detective Timothy Hurtt testified that he read defendant his *Miranda*[3] rights and taped the interview. This interview was played to the jury. After explaining the details of the fight at home, defendant explained that he went to Ms. Powell's home:

---

[3] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

*A.* Okay, so I went over there and busted the side window and went in and went downstairs.

*Q.* Okay.

*A.* And I hid.

*Q.* Were they there when you got there?

*A.* Police came shortly after and Regina and her mama talked to the police.

\*    \*    \*

*Q.* Okay, so you broke in the door, okay. Alright [sic], you say you were in the basement, the police came and Regina . . . go ahead.

*A.* Regina mama, she went through the house. The police say "you sure he not here," Regina mama say "No, he's not here" then the police left and Regina mama went back downstairs and went and picked up my socks and my coat, she looked at my coat. . . . Then she looked around, she went back upstairs, she knew I was there, she didn't say anything, she just, she didn't say anything.

*Q.* Where were you hiding at?

*A.* In the wash room.

\*    \*    \*

*A.* Cause she went upstairs, I went behind her, she didn't know it, she walked on through, I was upstairs sitting on the stairs, I said "God, I just want to talk to my wife, just want to talk to my wife and go home." And she was talking about, you know, she said "Hell, it's over between you and me" and her mama was saying "You don't need him" and this and that, dogging me up. And I said "Dang, what have I done to deserve this." Then her mama came downstairs; she had a mop, a big mop or something, . . . [and] she came downstairs. And I was down there cutting the phone line, cause I didn't want her calling, you know, to call the police on me.

*Q.* What were you cutting it with?

*A.* With a knife, the phone line.

*Q.* Alright [sic].

    *A.* Then she came down and she started beating me with
that instrument she had. . . . And I grabbed her and we
was tussling around and stuff and she said "Call the police,
call the police" and I pushed and then she did like this and I
looked (inaudible), I looked and she feel [sic], I was like
"Oh, my God" and then I run up the stairs, I said "No," you
know, and she was, I repeat she was not dead, I did not kill
her, she was not dead, indeed she was bleeding, I seen her
blood on the knife, and I said "Oh, my God." And I ran up
the stairs because of the fact it scared me, I'm not no crazy
person, I'm not no killer, I mean I've seen killers and I've
seen crazy people, and then I know they are crazy, I am not
one.

After describing the altercation with Ms. Warren over
the knife, he explained further:

    See if I was crazy I would be like bump it, I killed her
and everything else and then do what crazy people, I'm not
like that. She [Ms. Warren] said "Put the knife down," I said
"Oh," I threw the knife . . . . I knew that her ma was
bleeding and I was scared . . . .

Defendant then stated that the following morning, Ms.
Warren asked to be tied up before he went to the
store. He then explained that he only wanted the
American dream, but things got out of control.

    I can not describe it, all I know is anxiety was pulling me,
I was pissed off, I had been drinking, I got beat down by a
mop, and we were tussling with a knife. I pushed her, and I
looked and I looked over the knife and she was like "Call
the police" . . . .

When asked what happened when he left the house,
he explained that he returned home, and then
attempted to return to his wife.

I was all the way up to the street and I stopped, I seen the fire truck there . . . I turned that car around and went back to the crib . . . . After I left the crib, I hit the back road out of Battle Creek, police passing me left and right, I headed out . . . .

Although defendant presented expert testimony that he had emotional and psychological problems, and that he had been drinking, this is not enough to overcome the *Lukity* harmless error test. Given the strength of evidence presented against defendant for the crimes of felony murder and UDAA, it does not affirmatively appear that it is more probable than not that the error was outcome determinative. 460 Mich 496. Because of this properly admitted evidence, I would hold that the error was harmless under *Lukity*.